UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

| | |
|---|---|
| Yasser Abbas<br><br>1500 Riverside, Apt.707<br>Ottawa, Ontario,<br>Canada K1G4J4<br><br>     Plaintiff,<br>v.<br><br>Foreign Policy Group, LLC, a Division of<br>the Washington Post Company, and<br>Jonathan Schanzer,<br><br>     Defendants. | Civil Action No.: 12-cv-01565<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Yasser Abbas ("Plaintiff") brings this Complaint for defamation against the Foreign Policy Group, LLC, a Division of the Washington Post Company and Jonathan Schanzer ("Defendants") and states the following:

### JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(2) because the Plaintiff is a citizen of Canada and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

2. This Court has personal jurisdiction over the Defendants because the false and defamatory statements made by Defendants were published in the District of Columbia.

3. This Court has venue under 28 U.S.C. § 1391(a)(2) because a substantial portion of the events that gave rise to Plaintiff's claims transpired in the District of Columbia, including

the publication or republication of the defamatory falsehoods and the damage to Plaintiff's reputation.

## PARTIES

4. Plaintiff, Yasser Abbas is a businessman who operates businesses throughout the Middle East and the Gulf region.

5. Defendant, Foreign Policy Group, LLC, is a Division of the Washington Post Company, which publishes *Foreign Policy*, a magazine of global politics, economics, and ideas (hereinafter "FP").

6. On its website, FP advises that it is "ranked most credible among Influentials vs. the Competition."

7. FP Arabic is published bimonthly in partnership with Gulf Strategic Studies Center in Qatar. FP Arabic contains translated material from FP's flagship edition and is distributed throughout the Middle East.

8. Defendant Dr. Jonathan Schanzer is a Vice President for Research for Foundation for Defense of Democracies ("FDD")

## STATEMENT OF FACTS

9. Yasser Abbas and his brother, Tarek Abbas, are the sons of Mahmoud Abbas, the Palestinian President.

10. On June 5, 2012, defendant Jonathan Schanzer wrote an article in FP entitled, "The Brothers Abbas," with the subtitle, "Are the sons of the Palestinian President growing rich off their father's system?" (hereinafter the "FP article").

11. Neither Jonathan Schanzer nor FP made any effort to contact plaintiff prior to publication of the FP article.

12. Defendant Schanzer only used sources that supported his point of view, including only the first of 2 articles concerning plaintiff published by Al-Aswak.net economic magazine.

13. In the FP article, Schanzer then poses a further question, stating: "new details are emerging of how close family members of Palestinian leader Mahmoud Abbas, a major U.S. partner in the Middle East, have grown wealthy. Have they enriched themselves at the expense of regular Palestinians -- and even U.S. taxpayers?"

14. The FP article relies in large part on an allegation by Mohammed Rachid, a man with ample motivation to lie given his own prosecution for corruption, conviction within weeks of when the article was written, and his subsequent 15 year sentence for embezzlement, that President Abbas has hidden away "$100 million in ill-gotten gains."

15. After suggesting that there is evidence that the President has hidden away "$100 million in ill-gotten gains, in the FP article, Schanzer links plaintiff to this lie by his implication that: "The conspicuous wealth of Abbas's own sons, Yasser and Tarek, has become a source of quiet controversy in Palestinian society since at least 2009, when Reuters first published a series of articles tying the sons to several business deals, including a few that had U.S. taxpayer support."

16. In the FP article, Schanzer writes: "Yasser now owns Falcon Tobacco, which <u>reportedly enjoys</u> a monopoly on the sale of U.S.-made cigarettes in the Palestinian territories."

17. Although monopoly is widely viewed as meaning control of a market, FP contends that the word was used in the article in its common term, lay person sense to mean a

preferred or advantageous position in the market – not to imply that plaintiff has literally a 100% market share with absolutely no competition.

18.     In fact, plaintiff does not have *"a monopoly over the sale of US made cigarettes in the Palestinian territories."*

19.     Defendants' implication is that the Palestinian Authority has awarded plaintiff with a privileged economic position. In 1999 (long before Mahmoud Abbas became President) plaintiff was awarded a contract by UK headquartered BAT for distribution of their cigarettes in the Palestinian territories, after BAT fell out with its existing distributor which was also distributing competing brands.

20.     In fact, the cigarettes which Falcon Tobacco distributes are manufactured primarily in Turkey, and to a lesser degree in Switzerland, not the US, and constitute less than 3% of the market in the Palestinian Territories.

21.     In the FP article, defendant Schanzer writes: "According to the *Toronto Star*, Yasser also chairs Falcon Holding Group, a Palestinian corporate conglomerate that owns Falcon Electrical Mechanical Contracting Company (also called Falcon Electro Mechanical Contracting Company, or FEMC), an engineering interest that was established in 2000 and boasts offices in Gaza, Jordan, Qatar, the United Arab Emirates, and the West Bank."

22.     In the FP article, defendant Schanzer writes: FEMC's "business success has come with a helping hand from Uncle Sam: According to a Reuters report, Abbas's company received $1.89 million from USAID in 2005 to build a sewage system in the West Bank town of Hebron."

23.     In fact, FEMC has not "received $1.89 million from USAID in 2005."

24.     Neither this contract nor any others were awarded to plaintiff as a result of his being the son of President Abbas.

25. FEMC submitted a competitive tender for consultancy work in accordance with US Government contracting rules to the USAID and lost.

26. In the FP article, defendant Schanzer neglects to report that even the authors of the cited Reuters report stated that USAID confirmed that "family ties were not a consideration" and that the contracts were won through "full and open competitive bidding."

27. FEMC was ultimately awarded the contract based on its competitive price and bid. The project started in April 2005, but was terminated when less than half complete in June 2006 when Hamas took over the Palestinian Legislative Council, because of US objections to Hamas. FEMC received a total of $872,578, incurring a loss of $130,000 on the project.

28. In the FP article, defendant Schanzer states: "According to Yasser's biography, other arms of Falcon Holding Group include Falcon Global Telecommunication Services Company and Falcon General Investment Company, companies about which less is known. Through the Falcon companies, Yasser boasted to an Emirati magazine in 2009 that the companies' revenues total some $35 million per year."

29. In fact, the Falcon companies' revenues may have totaled some $35 million per annum in about 2005/6, but from 2006 onwards fell steadily to some 15% of that figure, but this does not equate to income for plaintiff because in the case of tobacco for example, approximately 93% of revenues were accounted for in cigarette costs, taxes and custom fees.

30. In the FP article, defendant Schanzer reports that plaintiff "is listed by the New York-based financial information database CreditRiskMonitor.com as the chairman of the publicly traded Al-Mashreq Insurance Company, with 11 offices across the Palestinian territories. The company is valued on the Palestinian stock exchange at $3.25 million."

31.   In fact, Plaintiff is the Chairman of Al-Mashreq Insurance Company, but owns only 2.85% of the shares, making his shareholding worth some $92,625 rather than the $3.25 million which the FP article suggests and he was approached by the major shareholder of the company to join it in 1999.

32.   In the FP article, defendant Schanzer reports: "Finally, Yasser serves as managing director of the First Option Project Construction Management Company, whose website suggests that it does a great deal of public works projects, such as road and school construction, on behalf of the Palestinian Authority. First Option employs at least 15 people in offices in Amman, Tunis, Cairo, Montenegro, and Ramallah. This enterprise also benefited from the U.S. government's financial support: As Reuters reported, First Option was awarded nearly $300,000 in USAID funds between 2005 and 2008."

33.   In fact, despite the reference to work done by plaintiff on behalf of the Palestinian Authority, the company did not win business because plaintiff's father was President of the Palestinian Authority.

34.   In 1996, plaintiff established First Option Project Construction Management Company, which is a consultancy rather than a construction company, which won a bid from CH2M HILL, a consultant to USAID, in 2005-2008 after competitive tendering, along with two other consulting companies, and received $296,933 in revenue for its work.

35.   In the FP article, defendant Schanzer reports: "Since the Arab Spring began in late 2010 and early 2011, the Abbas brothers have largely dropped out of sight in the West Bank. Where have they gone? According to an article written by Rachid on the staunchly anti-Abbas website InLight Press, the family owns lavish properties worth more than $20 million in Gaza, Jordan, Qatar, Ramallah, Tunisia, and the UAE."

6

36.     Plaintiff simply owns property, purchased with the profits from a lifetime in business, most successfully in the Gulf.

37.     In the FP article, defendant Schanzer reports: "Of course, the Abbas brothers' absence doesn't mean that Palestinians will forget. On a research trip to Ramallah last year, several Palestinians told me that the Abbas family dynasty is common knowledge. However, discussion of the issue rarely rises above a whisper -- thanks to growing fear of retribution by PA security officers, who have apprehended <u>journalists and citizens</u> for openly challenging President Abbas's authority."

38.     References to what "several Palestinians told me" by defendant Schanzer in the FP article is no evidence to support the allegation that Palestinian Authority security officers are being used to protect plaintiff's reputation but is an example of how defendants have defamed plaintiff by posing libelous questions and printing innuendos. What was purportedly said by "several Palestinians" is not true. On various Palestinian TV channels, such as the National Palestinian Channel, the people attack and criticize the President, the Prime Minster and the PA freely, and demonstrations take place in cities all over the West Bank.

39.     In the FP article, defendant Schanzer acknowledges: "The president's son is certainly entitled to do business in the Palestinian territories...." but then continues to libel plaintiff by posing questions: "But the question is whether his lineage is his most important credential -- a concern bolstered by the fact that he has occasionally served in an official capacity for the Palestinian Authority. In 2008, Yasser reportedly visited Kazakhstan as a <u>special envoy</u>, and according to a former Bush administration official, he regularly accompanies his father on official travel.'"

40. Plaintiff does sometimes accompany his father when his father is travelling on official trips and values being with his father (now 78) as any son would but he does not use such travel to exploit his connection to win business and defendants have not presented any evidence to the contrary. To the contrary, when plaintiff travels as a special envoy he does so only and strictly for the benefit of the Palestinians and the Palestinian cause and he bears all the travel expenses for himself.

41. In the FP article, defendant Schanzer poses his final libelous questions: "At a time when the sons of Arab strongmen are under scrutiny, the questions surrounding the Abbas brothers will not go away. Indeed, the Arab public continues to demand accountability from its leaders -- and the upcoming Rachid trial will only bring this controversy closer to Ramallah."

42. Plaintiff has not enriched himself at the expense of the Palestinian people. To the contrary, he has employed many Palestinians in companies in which he is involved, including in the contracts referred to above.

43. Plaintiff has, for no remuneration, done much work on behalf of the Palestinian people, including ensuring the repatriation to the Palestinian National Fund of $45 million held by Orascom Telecom, ensuring the resumption of US and Canadian aid to the UN Relief and Works Agency for Palestinian Refugees, providing financial assistance to Palestinian students for studies in Palestinian and other universities, providing financial aid to Palestinians freed from Israeli jails and assistance to others in need.

44. Plaintiff has not enriched himself at the expense of the US taxpayer.

45. Even if the figures ($2.19 million) cited in the FP article were accurate (they are not), they would be a drop in the ocean compared to the estimated total sum of $3.5 billion which USAID says it has provided to Palestine since 1994.

## COUNT I
(Libel Per Se –Injury to Personal Reputation)

46. Plaintiff incorporates by reference into this Count all of the allegations appearing in paragraphs 1-45 in this Complaint.

47. The FP article has caused, is causing, and will cause Plaintiff to suffer injury to his standing, to his reputation and good name; and will continue to hold Plaintiff up to public scorn, hatred and ridicule.

48. Plaintiff worked hard his entire life to build his reputation long before his father was President of the Palestinian Authority.

49. The FP article now tells the world that plaintiff is "growing rich" off his "father's system" and asked those he works with and all the world to wonder if plaintiff has "enriched" himself "at the expense of regular Palestinians -- and even U.S. taxpayers."

50. Publication of the FP article has had, and is having a seriously damaging effect on the reputation of plaintiff because, as a result of the continued publication of these allegations, various online blogs and articles are now commenting on and repeating these allegations, including translations into Arabic (e.g., on aljazeera.net, maannews.com, alwatanvoice.com), on countless online blogs and articles.

51. Publication of the FP article has caused damages to plaintiff in this district and throughout the world wherever the FP article is disseminated.

## COUNT II
(Libel per Se – Injury to Professional Reputation)

52. Plaintiff incorporates by reference into this Count all of the allegations appearing in paragraphs 1-51 of this Complaint.

53. The FP article has caused, is causing, and will cause Plaintiff to suffer injury to his standing, to his reputation and good name; and, they have held and will continue to hold Plaintiff to public scorn, hatred and ridicule.

54. The FP article, by suggesting that plaintiff has enriched himself at the expense of regular Palestinians -- and even U.S. taxpayers, will cause those in business to be concerned that doing business with plaintiff will cause them to be thought of as also enriching themselves at the expense of regular Palestinians and US taxpayers.

55. Publication of the FP article has caused damages to plaintiff in this district and throughout the world wherever the FP article is disseminated.

### COUNT III
(Libel - Actual Malice by Defendant Schanzer)

56. Plaintiff incorporates by reference into this Count all of the allegations appearing in paragraphs 1-55 of this Complaint.

57. On September 14, 2011, defendant Schanzer gave written testimony before the United States Congress House on Foreign Affairs on the topic of U.S. Aid to Palestinians ("Defendant Schanzer's 9/14/11 testimony").

58. Defendant Schanzer did not disclose in the FP article his 9/14/11 testimony before Congress.

59. Defendant Schanzer's 9/14/11 testimony "cites specific examples of corruption and malfeasance that require better oversight by the US Congress."

60. In Defendant Schanzer's 9/14/11 testimony he states that plaintiff's father is "abusing" his power, that one "egregious example is the Palestinian Investment Fund ("PIF") and that "Oversight of the PIF is long overdue."

61. In Defendant Schanzer's 9/14/11 testimony, he advises Congress that: "Another worthwhile inquiry would explore the way in which Abbas' sons, Yasser and Tarek, have accumulated wealth since their father took office in 2005."

62. In Defendant Schanzer's 9/14/11 testimony, he refers to the same Falcon Tobacco described in the FP article and states that as a result of a "monopoly" it has over the marketing of some brands of "US-made cigarettes" in the West Bank and Gaza Strip, plaintiff "Yasser Abbas has raked in untold millions."

63. In Defendant Schanzer's 9/14/11 testimony, he footnotes an article from more than two years earlier, Jerusalem Post, April 9, 2009, which contains no reference to plaintiff raking in "untold millions" from Falcon Tobacco sales.

64. In Defendant Schanzer's 9/14/11 testimony, he recommends that Congress: "Conduct an inquiry into the personal wealth of Mahmoud Abbas and his sons, Yasser and Tarek, to determine whether US funds have contributed to their personal holdings."

65. Defendant Schanzer did not disclose to the reader of the FP article that he had previously recommended to Congress that it "Conduct an inquiry into the personal wealth of Mahmoud Abbas and his sons, Yasser and Tarek, to determine whether US funds have contributed to their personal holdings."

66. Defendant Schanzer did not disclose to the reader of the FP article that his testimony before Congress contained essentially the same allegations he made in the FP article.

67. Subsequent to Defendant Schanzer's 9/14/11 testimony, Schanzer provided further testimony before Congress on July 10, 2012 ("Defendant Schanzer's 7/10/12 Congressional testimony").

68. Defendant Schanzer's 7/10/12 Congressional testimony was published on the website of the Foundation for Defense of Democracies and entitled "Chronic Kleptocracy," with the subheading: "Corruption Within The Palestinian Political Establishment."

69. Defendant Schanzer's 7/10/12 Congressional testimony in substance repeats and republishes what he wrote concerning plaintiff in the FP article.

70. Defendant Schanzer's 7/10/12 Congressional testimony sets forth "New Information on the Abbas Brothers" from 2009 based on conversations Defendant Schanzer had with unnamed foreign and "former US intelligence officials with additional information about the Abbas brothers' international operations."

71. Defendant Schanzer's 7/10/12 Congressional testimony stated that the information in the FP article "was gleaned from readily available sources online."

72. No sources online provide information to support the statement in the FP article: "Are the sons of the Palestinian President growing rich off their father's system?"

73. No sources online provide information to support the statement in the FP article questioning whether plaintiff enriched himself "at the expense of regular Palestinians -- and even U.S. taxpayers?"

74. Defendant Schanzer's 7/10/12 Congressional testimony concludes: "If self-governance is their goal, Palestinians must grapple with corruption, too."

75. Plaintiff is a private businessman and is not a public figure who must prove actual malice on the part of defendants to recover for Libel and Slander in this action.

76. Even if plaintiff was a public figure, the FP article and Defendant Schanzer's 9/14/11 testimony establish actual malice on the part of defendant Schanzer.

12

77. Publication of the FP article has caused damages to plaintiff in this district and throughout the world wherever the FP article is disseminated.

## COUNT IV
(Libel – Reckless Disregard/Malice by Defendant FP)

78. Plaintiff incorporates by reference into this Count all of the allegations appearing in paragraphs 1-77 of this Complaint.

79. The FP article's question and innuendos were published by FP with reckless disregard as to their truth.

80. FP has acknowledged that at least a half dozen of the alleged facts it published may need clarification or to update the article with a more precise description.

81. The subtitle in the FP article posing the question of whether "… the sons of the Palestinian President [are] growing rich off their father's system?" was published by FP with reckless disregard of the truth and was libelous.

82. The question in the FP article as to whether plaintiff was "enriching" himself at the expense of regular Palestinians -- and even U.S. taxpayers?" was published by FP with reckless disregard of the truth and was libelous.

83. The statements in the FP article concerning plaintiff's businesses were false.

84. The statements in the FP article concerning plaintiff's businesses were widely published and were not privileged in any manner.

85. Defendant FP either knew or recklessly disregarded the fact that Defendant Schanzer's 9/14/11 testimony should have been disclosed to readers.

86. The questions, innuendoes and statements in the FP article were published by FP with reckless disregard of their truth or falsity or with malice.

87. Publication by FP of the FP article has caused damages to plaintiff in this district and throughout the world wherever the FP article is disseminated.

## COUNT V
(Libel – By Implication)

88. Plaintiff incorporates by reference into this Count all of the allegations appearing in paragraphs 1-87 of this Complaint.

89. The FP article raises questions and makes innuendoes and suggestions about whether plaintiff enriched himself at "the expense of regular Palestinians -- and even U.S. taxpayers."

90. The FP article by implication suggests the existence of other facts about plaintiff that are defamatory.

91. The statements in the FP article concerning plaintiff's businesses were widely published and were not privileged in any manner.

92. Defendants acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

93. The FP article was libelous by implication.

94. Publication of the FP article has caused damages to plaintiff in this district and throughout the world wherever the FP article is disseminated.

**PRAYER FOR RELIEF**

95. Plaintiff demands judgment against Defendants, jointly and severally, as follows: (i) for compensatory damages in the amount of $10 million ($10,000,000) on all Counts I

through V in the Complaint: (ii) punitive damages in the amount of $10 million ($10,000,000) on all Counts I through V in the Complaint; (iii) both pre-judgment and post-judgment interest on all Counts; and, (iv) such other and further relief as this Court finds just and equitable.

## JURY TRIAL

Plaintiff demands a jury trial.

Respectfully submitted,

**MELITO & ADOLFSEN P.C.**

S. Dwight Stephens, DC Bar # 406176
Louis G. Adolfsen
Rania Shoukier
Michael F. Panayotou
*Of Counsel*
233 Broadway
New York, New York 10279
Telephone: (212) 238-8900
Facsimile: (212) 238-8999
E-mail: sds@melitoadolfsen.com
E-mail: lga@melitoadolfsen.com
E-mail: Shoukier@arablegalusa.com
E-mail: mfp@melitoadolfsen.com

96517