## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **YASSER ABBAS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 12-cv-01565** |
| | ) | |
| **FOREIGN POLICY GROUP, LLC,** | ) | |
| **A DIVISION OF THE WASHINGTON POST** | ) | |
| **COMPANY, AND** | ) | |
| **JONATHAN SCHANZER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' SPECIAL MOTION TO DISMISS
## THE COMPLAINT PURSUANT TO THE D.C. ANTI-SLAPP ACT

Pursuant to the District of Columbia Anti-SLAPP Act of 2010, D.C. Code § 16-5502(a) ("the Anti-SLAPP Act" or "the Act"), Defendants Foreign Policy Group, LLC and Jonathan Schanzer hereby respectfully move for an order dismissing the Complaint with prejudice.  In the event that the motion is granted, Defendants reserve the right to file a motion seeking an award of the costs of litigation hereof, including attorneys' fees, as provided by D.C. Code § 16-5504(a), within fourteen days after the entry of judgment.  Fed. R. Civ. P. 54(d)(2).

For the reasons set forth more fully in the accompanying memorandum, declarations in support thereof and exhibits attached thereto, Defendants' publication is protected by the Anti-SLAPP Act, as it constitutes an "[a]ct in furtherance of the right of advocacy on issues of public interest," D.C. Code § 16-5502(a), and Plaintiff Yasser Abbas is unable to discharge the heavy burden the Act imposes on him to demonstrate that he is "likely to succeed on the merits" of his defamation claims.  D.C. Code § 16-5502(b).

WHEREFORE, for the reasons set forth more fully in the accompanying memorandum, declarations in support thereof and exhibits attached thereto, Defendants respectfully request that the Court grant their special motion to dismiss and enter judgment in their favor dismissing the Complaint with prejudice.

## **REQUEST FOR HEARING**

Pursuant to Local Rule 7(f) of this Court, Defendants respectfully request that the Court hold a hearing on this special motion to dismiss.

Dated: November 5, 2012                          Respectfully submitted,

By:   /s/ Kevin T. Baine                          By:   /s/ Nathan E. Siegel

WILLIAMS & CONNOLLY LLP                 LEVINE SULLIVAN KOCH & SCHULZ, LLP

Kevin T. Baine (Bar No. 238600)            Nathan E. Siegel (Bar No. 446253)
Adam Tarosky (Bar No. 983920)             Seth D. Berlin (Bar No. 433611)
Elise Borochoff (Bar No. 1006246)          Shaina D. Jones (Bar No. 1002801)

725 Twelfth Street, NW                          1899 L Street, NW, Suite 200
Washington, DC 20005                          Washington, DC  20036
Telephone: (202) 434-5000                     Telephone: (202) 508-1100
Facsimile: (202) 434-5029                      Facsimile: (202) 861-9888
kbaine@wc.com                                    nsiegel@lskslaw.com
atarosky@wc.com                                 sberlin@lskslaw.com
eborochoff@wc.com                             sjones@lskslaw.com

*Counsel for Defendant Foreign Policy*         *Counsel for Defendant Jonathan Schanzer*
*Group, LLC*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **YASSER ABBAS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 12-cv-01565** |
| | ) | |
| **FOREIGN POLICY GROUP, LLC,** | ) | |
| **A DIVISION OF THE WASHINGTON POST** | ) | |
| **COMPANY, AND** | ) | |
| **JONATHAN SCHANZER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
SPECIAL MOTION TO DISMISS PURSUANT TO THE D.C. ANTI-SLAPP ACT**

WILLIAMS & CONNOLLY LLP

Kevin T. Baine (Bar No. 238600)
Adam Tarosky (Bar No. 983920)
Elise Borochoff (Bar No. 1006246)

725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
kbaine@wc.com
atarosky@wc.com
eborochoff@wc.com

*Counsel for Defendant Foreign Policy
Group, LLC*

LEVINE SULLIVAN KOCH & SCHULZ, LLP

Nathan E. Siegel (Bar No. 446253)
Seth D. Berlin (Bar No. 433611)
Shaina D. Jones (Bar No. 1002801)

1899 L Street, NW, Suite 200
Washington, DC  20036
Telephone: (202) 508-1100
Facsimile: (202) 861-9888
nsiegel@lskslaw.com
sberlin@lskslaw.com
sjones@lskslaw.com

*Counsel for Defendant Jonathan Schanzer*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 3

    A.     President Mahmoud Abbas ............................................................................... 3

    B.     The Public Controversy Regarding Alleged Corruption in the
              Palestinian Authority ...................................................................................... 5

    C      Plaintiff Yasser Abbas ..................................................................................... 6

           1.     Yasser Abbas's Business Ventures ..................................................... 6

           2.     Yasser Abbas's Long-Running Political Advocacy on Behalf
                 of His Father ....................................................................................... 9

    D.     The Controversy Surrounding Yasser Abbas's Dual Roles ................................ 11

    E.     Yasser Abbas's Participation in These Controversies ........................................ 13

    F.     Yasser Abbas's Persistent Use of Litigation and Threats of Litigation
              Against His Critics .......................................................................................... 14

    G.     Foreign Policy Magazine ................................................................................ 15

    H.     Dr. Jonathan Schanzer and the Commentary ..................................................... 16

    I.      Congressional Investigation of U.S. Aid to the Palestinian Authority ................ 18

ARGUMENT ..................................................................................................................... 19

I.      ABBAS'S COMPLAINT SHOULD BE DISMISSED UNDER THE PROTECTION
         CONFERRED BY THE DISTRICT OF COLUMBIA'S ANTI-SLAPP STATUTE ....... 19

    A.     The Anti-SLAPP Act's Protection Applies To This Action ................................ 19

    B.     Abbas's Complaint Triggers The Anti-SLAPP Act's Protection ......................... 22

    C.     To Overcome the Statutory Protection and Avoid Dismissal, Abbas
             Must Demonstrate that He is Likely to Succeed on the Merits of
             His Claims ..................................................................................................... 26

II.    ABBAS CANNOT CARRY HIS BURDEN OF DEMONSTRATING HE IS
LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS......................................26

CONCLUSION..........................................................................................................................28

# TABLE OF AUTHORITIES

Page(s)

CASES

3M Co. v. Boulter,
    842 F. Supp. 2d 85 (D.D.C. 2012) .........................................................................21

Aronson v. Dog Eat Dog Films, Inc.,
    738 F. Supp. 2d 1104 (W.D. Wash. 2010) ..............................................................22

Balestra-Leigh v. Balestra,
    No. 3:09-CV-551, 2010 WL 4280424 (D. Nev. Oct. 19, 2010) ...............................22

Bible & Gospel Trust v. Twinam,
    No. 1:07-CV-17, 2008 WL 5245644 (D. Vt. Dec. 12, 2008) ...................................22

Blumenthal v. Drudge,
    No. Civ. A. 97-1968, 2001 WL 587860 (D.D.C. Feb. 13, 2001) ............................22

Brown v. Wimberly,
    477 F. App'x 214 (5th Cir. 2012) ............................................................................21

Buckley v. DIRECTV, Inc.,
    276 F. Supp. 2d 1271 (N.D. Ga. 2003) ...................................................................22

Chandok v. Klessig,
    632 F.3d 803 (2d Cir. 2011).....................................................................................21

*Chapin v. Knight-Ridder, Inc.,
    993 F.2d 1087 (4th Cir. 1993) .................................................................................27

Chi v. Loyola University Medical Center,
    787 F. Supp. 2d 797 (N.D. Ill. 2011) ......................................................................22

Containment Technologies Group Inc. v. American Society of Health System
    Pharmacists,
    No. 1:07-cv-0997-DFH-TAB, 2009 WL 838549 (S.D. Ind. Mar. 26, 2009) ..........22

Curtis Publishing Co. v. Butts,
    388 U.S. 130 (1967)..................................................................................................27

*Farah v. Esquire Magazine,
    863 F. Supp. 2d 29 (D.D.C. 2012) ..................................................................... passim

Gardner v. Martino,
    563 F.3d 981 (9th Cir. 2009) ...................................................................................21

*Global Relief Foundation v. New York Times Co.*,
  No. 01 C 8821, 2002 WL 31045394 (N.D. Ill. Sept. 11, 2002)............................................22

*Godin v. Schencks*,
  629 F.3d 79 (1st Cir. 2010) ....................................................................................................21

*Masson v. New Yorker Magazine, Inc.*,
  501 U.S. 496 (1991)................................................................................................................27

*Mero v. United States Figure Skating Association*,
  No. 2:07-CV-159, 2006 WL 163529 (E.D. Mich. Jan. 20, 2006) ..........................................22

*Monaco Entertainment Group v. City of El Paso*,
  No. EP-11-CV-561-DB (W.D. Tex. Apr. 3, 2012).................................................................22

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964)................................................................................................................27

*Ollman v. Evans*,
  750 F.2d 970 (D.C. Cir. 1984) .........................................................................................27, 28

*Price v. Stossel*,
  No. 07-Cv. 11364, 2008 WL 2434137 (S.D.N.Y. June 4, 2008)...........................................22

*Russell v. Krowne*,
  No. DKC 2008-2468, 2010 WL 2765268 (D. Md. July 12, 2010).........................................22

*Sherrod v. Breitbart*,
  843 F. Supp. 2d 83 (D.D.C.) .............................................................................................21, 26

*Tennenbaum v. Arizona City Sanitary District*,
  799 F. Supp. 2d 1083 (D. Ariz. 2011) ...................................................................................22

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*,
  190 F.3d 963 (9th Cir. 1999) .............................................................................................21-22

*United States v. El-Mezain*,
  664 F.3d 467 (5th Cir. 2011) ..................................................................................................24

*USANA Health Sciences, Inc. v. Minkow*,
  No. 2:07-CV-159, 2008 WL 619287 (D. Utah Mar. 4, 2008) ...............................................22

*Waldbaum v. Fairchild Publications, Inc.*,
  627 F.2d 1287 (D.C. Cir. 1980)..............................................................................................25

*White v. Fraternal Order of Police*,
  909 F.2d 512 (D.C. Cir. 1990).................................................................................................27

CONSTITUTIONS, STATUTES, AND RULES

U.S. Const. amend. I ...................................................................................................3, 28

*D.C. Code § 16-5501, *et seq.* .......................................................................... *passim*

Federal Rule of Civil Procedure 54(d)(2). ..................................................................1

OTHER AUTHORITIES

*2012 to witness consulate of Kazakhstan in Palestine*, Kazinform (Apr. 9, 2012) ......................10

*Abbas Could Be Next Domino to Fall*, NEWSTEX WEB BLOGS-INTERNATIONAL PROJECT ON TERRORISM (Oct. 7, 2011) .................................................................12

*Abbas son says* [sic] *to sue US magazine over wealth claims*, MA'AN NEWS AGENCY (June 12, 2012).........................................................................................17

Adam Entous, *Firms run by President Abbas's sons get U.S. contracts*, REUTERS (Apr. 22, 2009) ................................................................................................12

Aisling Byrne, *Building a police state in Palestine*, FOREIGN POLICY (Jan. 18, 2011)........... 15-16

*Amir receives message from Mohamoud Abbas on boosting ties*, KUWAIT NEWS AGENCY, May 15, 2012 .........................................................................................9

Benoit Faucon, *INTERVIEW: Palestinian Pres' Son Vows Peace And Free Mkts*, Dow Jones Newswires, Jan 18, 2005.........................................................................9, 12

Campbell Clark, *Abbas' son seeking more political, financial backing*, THE GLOBE & MAIL, July 6, 2007 ..........................................................................................10

Campbell Clark, *PM opposes Palestinian statehood bid*, GLOBE & MAIL, Sept. 21, 2011..... 10-11

*Chronic Kleptocracy: Corruption within the Palestinian Politacal Establishment, Hearing before the Subcomm. On the Middle East and South Asia of the H. Comm. On Foreign Affairs*, Cong. 112-167 (2012) ............................................................19

Del Jones, *Plans for prosperity die amid fighting in Mideast*, USA TODAY, Sept. 24, 2003..........7

Executive Order No. 12947 (Pres. Exec. Order, issued Jan. 23, 1995) ........................................24

*Focus: Middle East Nepotism: Abu Mazen's Sons Go to Court, Again*, ARABIA DESERTA (Jan. 17, 2012)..................................................................................................15

Greg Myre, *Palestinian Prosecutor Cites Progress Against Corruption*, N.Y. TIMES, Mar. 9, 2006.........................................................................................................5

Ike Seamans, *What do Palestinians Do With Humanitarian Aid Money?*, THE MIAMI HERALD, Jan. 25, 2003 ........................................................................................................12

Isabel Kershner, *Spreading Palestinian Protests Focus on Leaders*, N.Y. TIMES, Sept. 11, 2012.................................................................................................................................5

Jean-François Legrain, *The Successions of Yassir Arafat*, 28 J. PALESTINE STUD. 4, Summer 1999 ..................................................................................................................11

Jonathan Schanzer, *The Brothers Abbas, Are the sons of the Palestinian president growing rich off their father's system?*, FOREIGN POLICY (June 5, 2012)..............................17

Khaled Abu Toameh, *Abbas takes son on official visit to Qatar*, THE JERUSALEM POST, Feb. 22, 2009.................................................................................................................12

Khaled Abu Toameh, *PA officials scandalized at disclosure by Abbas's son of vast personal fortune. Millionaire Yasser Abbas blasts Hamas for economic crisis, says the PA owes him money and claims "most Palestinians collaborate with Israel,"* THE JERUSALEM POST (Apr. 17, 2009) .................................................................... 6-7, 9

Khaled Abu Toameh, *Palestinians deny secret talks with Israel*, THE JERUSALEM POST, Sept. 23, 2003 ................................................................................................................11

*Mahmoud Abbas (Palestinian Leader)*, ENCYCLOPEDIA BRITANNICA .......................................4, 5

Marian Houk, *Excerpts from an interview with Yasser Abbas in Ramallah – 18 December 2008*, UN-TRUTH (Oct. 15, 2009).................................................................... passim

Matt Rees, *From the Shadows to Center Stage*, TIME (Feb. 14, 2005) ...........................................4

Oakland Ross, *Canadian links us to Palestinian political elite*, TORONTO STAR (Apr. 27, 2009) ............................................................................................................................9

Olah Madhoun, *Abbas's sons repair roads and US public image*, MENASSAT (Apr. 29, 2009) ............................................................................................................................15

*Palestinian government cracks down on critics*, ASSOCIATED PRESS, Apr. 27, 2012 ...................6

*Palestinian leader's son sue Israeli TV over cell phone report*, BBC, Mar. 19, 2008 .................14

*Promoting Peace?  Reexamining U.S. Aid to the Palestinian Authority, Part II: Hearing Before the H. Comm. On Foreign Affairs*, 112th Cong. 112-68 (2011) .................................18

REUTERS, *USAID contracts with firms headed by Abbas's sons (Apr. 22, 2009)* .....................7, 15

Robert Terris & Vera Inoue Terris, *Case Study of Third World Jurisprudence-Palestine: Conflict Resolution and Customary Law in a Neopatrimonial Society*, 20 BERKLEY J. INT'L L. 462 (2002) ................................................................................................ 11-12

*Shaikh Salman receives Yasser Abbas*, BAHRAIN NEWS AGENCY, Jan 14, 2006.......................9-10

Stephen M. Walt, *What's Going on in Israel?*, FOREIGN POLICY (July 12, 2012) .......................15

*The Palestinians Need Money Like Yasser Needs Chutzpah*, THE NEW YORK POST, Dec.
   1, 1998.................................................................................................................................11

Tony Karon, *Palestinian Reform: A User's Guide*, TIME (May 17, 2002).....................................4

In support of their Special Motion to Dismiss filed pursuant to the District of Columbia

Anti-SLAPP Act of 2010, D.C. Code § 16-5502(a), Defendants Foreign Policy Group, LLC and

Jonathan Schanzer (collectively, "Defendants"), respectfully submit the following memorandum

of points and authorities.

## **INTRODUCTION**

Plaintiff Yasser Abbas ("Plaintiff" or "Abbas") is a prominent businessman who, along

with his brother, has interests in numerous sectors of the Palestinian economy.  Abbas, son of

Palestinian Authority President Mahmoud Abbas, also serves as a politician, often hand-picked

by his father to represent the Palestinian Authority on official government business.

Nonetheless, he essentially maintains that no one has the right even to question whether there is a

relationship between his political lineage and his wealth.  And, if anyone does, he serially brings

and threatens libel suits around the world to chill criticism.  Indeed, prior to bringing this case,

Abbas's London-based solicitors boasted that Abbas "has in the past taken legal action in respect

of similar defamatory allegations made against him (including on Al Jazeera, Israeli TV

Channel 1, and by Richard Falk, UN Special Rapporteur on human rights in the Palestinian

Territories)."  Declaration of Shaina D. Jones ("Jones Decl.") Ex. 34 (Letter from Rupert Earle,

Esq., Bates Wells & Braithwaite, Solicitors to Susan B. Glasser, Editor In Chief, *Foreign Policy

Magazine* at 4 (July 23, 2012)).  While Abbas's legal strategy might sometimes be effective in

places in the world with lesser protection for freedom of speech and the press than in the United

States, it certainly cannot pass muster under the First Amendment – let alone in the District of

Columbia, which has enacted legislation to address this precise scenario, which involves a

classic Strategic Lawsuit Against Public Participation ("SLAPP").

The District of Columbia's Anti-SLAPP Act of 2010, D.C. Code § 16-5501 *et seq.* ("Anti-SLAPP Act"), was enacted to ensure that those who criticize or raise questions about public figures are not intimidated into silence by plaintiffs like Abbas whose avowed agenda is to stifle their critics by threatening litigation and imposing on them substantial litigation costs, rather than to recover fair compensation for anything the law recognizes as a genuine injury.  As the Council's Committee on Public Safety and the Judiciary explained when it reported the bill, the Anti-SLAPP Act exists to put a swift end to lawsuits such as this one, "the goal of [which] is not to win . . . but punish the opponent and intimidate them into silence," in other words, cases in which "'*litigation itself* is the plaintiff's weapon of choice.'"  Jones Decl. Ex. 37 at 4 (Committee Report) (emphasis in original).

The Anti-SLAPP Act immunizes from liability speech "in furtherance of the right of advocacy on issues of public interest," including commentary about issues under review by the any of the branches of government, expression about public figures or statements addressing matters of public concern.[1]  Precisely in order to prevent litigants from inflicting "revenge" in the form of crippling defense costs and onerous discovery, the Act stays all discovery, provides for prompt dismissal with prejudice of a SLAPP suit such as this one, and permits recovery by defendants of their attorneys' fees and costs.  Only if Abbas is able to carry the heavy burden of demonstrating to this Court that he is "*likely* to succeed on the merits" of his defamation claim can this case be permitted to proceed.  Because he cannot, his complaint must be dismissed with prejudice and Defendants should be awarded their fees in defending this action.

---

[1] The Commentary at issue and each of the hyperlinked articles included in the Commentary are attached as Exhibits A and B to Defendants' contemporaneously filed Motion to Dismiss for Failure to State a Claim.  To the extent that any of the hyperlinked articles are also cited in this motion, these articles are attached to hereto as an exhibit to the Jones Declaration.

Abbas complains about an opinion piece published by Foreign Policy magazine ("FP") and authored by Dr. Jonathan Schanzer that, as its headline indicates, asks the question: "The Brothers Abbas: Are the sons of the Palestinian president growing rich off their father's system?" (the "Commentary"). In addressing the questions raised by the Commentary, it discusses a number of publicly available sources, and includes hyperlinks to such sources so that readers are free to draw their own conclusions. As demonstrated in the contemporaneously-filed Motion to Dismiss for Failure to State a Claim, the Commentary is not actionable as a matter of law because: (a) it is structured around unanswered questions that do not assert verifiable facts; (b) it is, at most, an expression of opinion protected by the First Amendment and the "fair comment" privilege; (c) the specific allegedly defamatory statements are not "of and concerning" Abbas, are not capable of a defamatory meaning, and/or are substantially true; and (d) Plaintiff's complaint fails to plead and in many instances negates facts that would support a finding that Defendants acted with the requisite degree of fault. Because Abbas cannot meet his burden of establishing a likelihood of success on the merits, his complaint should be dismissed with prejudice.

## STATEMENT OF FACTS

Abbas is both a prominent international businessman and active participant in Palestinian political affairs. To provide the background for the public controversy his dual roles have provoked for more than a decade, we briefly provide the context for the controversy addressed in the Commentary at issue in this case.

### A.   President Mahmoud Abbas

The FP Commentary begins by discussing a recent controversy concerning allegations and counter-allegations of corruption in the Palestinian Authority involving its President,

Mahmoud Abbas, who is Plaintiff's father.  President Abbas was an early pioneer of the

Palestinian national movement, having been one of the original founders, along with Yasser

Arafat, of "Fatah," the principal group forming the Palestine Liberation Organization ("PLO"),

of which he now serves as Chairman.  Jones Decl. Ex. 1 (*Mahmoud Abbas (Palestinian Leader*),

ENCYCLOPEDIA BRITANNICA,  http://www.britannica.com/EBchecked/topic/906746/Mahmoud-

Abbas (last visited Nov. 2, 2012)).

Like much of the rest of the PLO leadership, President Abbas had lived in exile abroad

since the 1948 war that resulted in the establishment of the state of Israel.  *Id.*  In the 1990s, he

stepped into the international spotlight when he became a principal negotiator for the PLO of the

1993 Oslo Accords with Israel, which he ultimately signed on the White House lawn along with

then-PLO chairman Yasser Arafat.  *Id.  See also id.*, Ex. 2 (Matt Rees, *From the Shadows to

Center Stage*, TIME (Feb. 14, 2005),

http://www.time.com/time/magazine/article/0,9171,1027501,00.html)).  The agreement called

for the implementation of Palestinian self-rule in portions of the West Bank and Gaza Strip and

established the Palestinian Authority ("PA") as an interim body.  *Id.*, Ex. 3 (Tony Karon,

*Palestinian Reform: A User's Guide*, TIME (May 17, 2002),

http://www.time.com/time/world/article/0,8599,238549,00.html)).   In or around 1995, along

with Arafat and many others, President Abbas, who is frequently referred to by the name "Abu

Mazen," moved to the Palestinian territories in the West Bank and Gaza Strip where he

continued to play a prominent role in Palestinian political affairs.  *Id.*, Ex. 1 (*Mahmoud Abbas

(Palestinian Leader),* ENCYCLOPEDIA BRITANNICA).

 In 1996, President Abbas became the Secretary-General of the PLO Executive

Committee, a post he held until Arafat's death, at which time he was elected as chairman.  In

2003 he briefly served as the prime minister of the PA; he was elected President of the PA in
2005 and has served in that role ever since.  *Id.*

**B.**     **The Public Controversy Regarding Alleged Corruption in the Palestinian Authority**

Since its formation in the 1990s, the Palestinian Authority has long been the subject of
allegations of corruption, both under President Arafat and President Abbas.  *See, e.g.,* Jones
Decl. Ex. 4 (Greg Myre, *Palestinian Prosecutor Cites Progress Against Corruption*, N.Y. TIMES,
Mar. 9, 2006, at A3 ("[u]nder Mr. Arafat, some of the Authority's revenues went to its Finance
Ministry, while others went directly to Mr. Arafat's office.  For years the Israeli government
deposited some of the taxes it collected for the Palestinians directly into an Israeli bank account
controlled by Mr. Arafat," and "Mr. Arafat entrusted large sums of money to long time
associates with little or no oversight.")); *id.*, Ex. 5 (Isabel Kershner, *Spreading Palestinian
Protests Focus on Leaders*, N.Y. TIMES, Sept. 11, 2012, at A6 ("Imbued with the spirit of the
Arab Spring uprisings that shook the region and toppled long-entrenched leaders in Tunisia,
Egypt and Libya, protesters in this volatile city adapted the popular slogans of those revolts,
calling for the downfall of Mr. Abbas and denouncing corruption in the Palestinian Authority.")).
Indeed, Plaintiff's own words in an interview make clear that the existence of a public
controversy over this issue cannot seriously be disputed:

> Well, you know, I mean, we are really confused over how the world, they want to
> look at us.  As far as the government is concerned, for the past 13, 14 years, we
> have been stamped with corruption.  Until now, wherever we go, they talk about
> our corruption.  And they know, deep inside, that this cracked [broken] record, in
> my terminology, has been played all around these years.  But, whoever you talk
> about, they're like all my visits sometimes to the U.S., they still talk about
> corruption.  They are still talking that four years ago.

*id.*, Ex. 6 (Marian Houk, *Excerpts from an interview with Yasser Abbas in Ramallah – 18
December 2008* ("*Yasser Abbas Interview*") *Part 3:  Business and Businessmen in Palestine – a*

*glimpse into the views of Yasser Abbas*, UN-TRUTH (Oct. 15, 2009), http://un-truth.com/qatar/business-and-business-in-palestine-a-glimpse-into-the-views-of-yasser-abbas, (alteration in original)).

More recently, many news organizations have reported that President Abbas has moved to silence his critics by shutting down websites critical of his administration, and authorizing the arrest of journalists and an anti-corruption activists who have criticized Abbas and other Palestinian officials on Facebook.  *Id.*, Ex. 7 (*Palestinian government cracks down on critics*, ASSOCIATED PRESS, Apr. 27, 2012).

**C.     Plaintiff Yasser Abbas**

**1.     Yasser Abbas's Business Ventures**

After graduating from Washington State University in 1983, Yasser Abbas was a relatively obscure businessman until the mid-1990s, when he also moved to the West Bank shortly after the establishment of the PA.  He and his brother Tarek quickly began establishing businesses in multiple sectors of the Palestinian economy.  As Abbas stated in an interview, "the first company that I've ever established in my life – no, it's not the first company, I established one in Canada, but maybe the second company I established in my life was in Palestine, in Ramallah, in 1996."  Jones Decl. Ex. 6 (*Yasser Abbas Interview, Part 1:  Fatah and Hamas – The Abbas family house in Gaza,* http://un-truth.com/israel/fatah-and-hamas-and-the-abbas-family-house-in-gaz).

By his own admission, Abbas became very wealthy from these endeavors, which reach into multiple sectors of the Palestinian economy.  *Id.*, Ex. 8 (Khaled Abu Toameh, *PA officials scandalized at disclosure by Abbas's son of vast personal fortune. Millionaire Yasser Abbas blasts Hamas for economic crisis, says the PA owes him money and claims "most Palestinians*

6

*collaborate with Israel,"* THE JERUSALEM POST (Apr. 17, 2009) ("Toameh Article"),

http://www.jpost.com/LandedPages/PrintArticle.aspx?id=139339 ("I worked very hard to collect

my fortune.'")); *see also id.*, Ex. 6 (*Yasser Abbas Interview, Part 3* ("[W]e [Palestinians] are

very successful businessmen, and I can say it in a very loud voice.  Everybody knows

that.  Nobody can deny that.  It's very simple: we are really Grade A businessmen.")).  According

to his biography on the website of one of his businesses (which was removed from the Internet

shortly after the publication of the Commentary at issue), he "established First Option consulting

engineering company," for which his responsibilities included "managing the construction and

project management team."  *See* Mem. of Points & Auth. in Supp. of Defs.' Mot. to Dismiss

("MTD Mem.") Ex. B).  His businesses include Falcon Holding Group, of which he is the

Chairman, a conglomerate that includes telecommunication, investment, electronic, tobacco and

engineering companies.  *Id.*  He is also "Chairman of Al-Mashriq Insurance Company, Co-

Chairman of the Canadian-Palestinian Business Council and Chairman of Young Entrepreneurs-

Palestine."  *Id.*; *see also* Jones Decl. Ex. 9 (REUTERS, *USAID contracts with firms headed by

Abbas's sons* (Apr. 22, 2009), http://uk.reuters.com/article/2009/04/22/idUKLV965456 (noting

aid to Yasser's  Falcon Electro Mechanical Contracting Company, First Option Company, and

Sky Advertising Company)); *id.*, Ex. 10 (Credit Risk Monitor profile of Al Mashreq Insurance

Company PLC, *available at*

http://www.crmz.com/Report/ReportPreview.asp?BusinessId=11274114.

      Yasser Abbas's business ventures have long been heavily covered by the international

news media.  *E.g.*, *Id.*, Ex. 11 (Del Jones, *Plans for prosperity die amid fighting in Mideast*, USA

TODAY, Sept. 24, 2003 at 1B ("Yasser Abbas . . . is a leading Arab businessman in the region.

He is chairman of the Falcon Group, which owns Falcon Telecom and Falcon Tobacco, and is a

trustee of OneVoice, a group of Jewish and Arab business leaders.")).  One business that has

often received particular notice is Falcon Tobacco Group.  According to Mr. Abbas, his company

is the exclusive importer of cigarettes from British American Tobacco Company, which as he

notes, "happens to be one of the largest in the world."  *Id.*, Ex. 6 (*Yasser Abbas Interview*,

*Part 1*).  In fact, BAT touts itself as the "second largest quoted tobacco group in global market

share" which holds "robust market positions in each of our regions."  *Id.*, Ex. 13 (*British*

*American Tobacco – Who We Are*, BRITISH AMERICAN TOBACCO,

http://www.bat.com/group/sites/uk__3mnfen.nsf/vwPagesWebLive/DO52ADCY?opendocument

&SKN=1, (last visited Oct. 24, 2012) ("BAT profile")).  Moreover, R.J. Reynolds Company, one

of the largest and best-known tobacco companies in the United States, is essentially a BAT

affiliate.  The conglomerate's cigarettes include such household brand names as Kent and Lucky

Strike.  *Id.*

        Mr. Abbas describes his relationship with BAT as follows:

> Falcon Tobacco Company – we are the importers of British-
> American tobacco.  We have negotiated this, and it is one
> company, and it is not the monopoly of the importation of
> cigarettes in the world.  I hope you understand this.  British-
> American is one company.  Philip Morris is another company.
> Gauloise is another company.  And all the other importation from
> Israel is another company.  So, it's a big, broad market.  BAT –
> British-American Tobacco – happens to be one of the largest in the
> world.  We are their importers since nine years.

*Id.*, Ex. 6 (*Yasser Abbas Interview, Part 1*).

        While no one disagrees with the proposition that Mr. Abbas does not enjoy "the

monopoly of importation of cigarettes in the world," numerous commentators and journalists

have long noted the significance of Mr. Abbas's position in this market, including referring

(accurately) to his exclusive importation/distribution agreements with BAT as a "monopoly" on

the sale of important "U.S.-made" or "U.S.-branded" cigarettes.  *See id.*, Ex. 8 (Toameh Article

("One of his smaller companies, Falcon Tobacco, has a monopoly over the marketing of US-made cigarettes such as Kent and Lucky in the West Bank and Gaza strip."); *id.*, Ex. 14 (Oakland Ross, *Canadian links us to Palestinian political elite,* TORONTO STAR, (Apr. 27, 2009), http://www.thestar.com/article/624798--canadian-links-us-to-palestinian-political-elite ("[Yasser] struck the carcinogenic equivalent of gold early this decade when he obtained a monopoly on the distribution of American cigarette brands such as Lucky Strike, Kent and Viceroy in the West Bank and Gaza.")); *see also id.* Ex. 13 (Benoit Faucon, *INTERVIEW: Palestinian Pres' Son Vows Peace And Free Mkts*, DOW JONES NEWSWIRES, Jan. 18, 2005 ("Faucon Article") ("For Abbas, the cigar [he smokes] signifies profits, for he is the local distributor of the British-American Tobacco PLC (BTI), and selling these products is one of the most profitable businesses in the Palestinian Authority.")). In fact, when Hamas in 2006 launched a coup seizing control of the Gaza Strip (thus leaving President Abbas effectively in control only of the West Bank), Yasser Abbas claimed that Hamas robbed his tobacco stores and caused him to incur the greatest economic loss from the coup of any individual. *Id.*, Ex. 6 (*Yasser Abbas Interview, Part 1*).

## 2. Yasser Abbas's Long-Running Political Advocacy on Behalf of His Father

Along with pursuing his business interests, for more than a decade Abbas has simultaneously played a prominent role in Palestinian political affairs, including regularly serving as a political emissary for his father to other countries and at international gatherings. *See, e.g.*, Jones Decl. Ex. 15 (*Amir receives message from Mahmoud Abbas on boosting ties*, KUWAIT NEWS AGENCY, May 15, 2012 ("Yasser Mahmoud Abbas who handed His Highness a written message from President of the Palestinian National Authority Mahmoud Abbas dealing with means of boosting bilateral ties, regional and international affairs")); *id.*, Ex. 16 (*Shaikh*

*Salman receives Yasser Abbas*, BAHRAIN NEWS AGENCY, Jan. 14, 2006 ("Yasser Mahmoud Abbas . . . conveyed his father's condolences and sympathy to H.M. King Hamad bin Isa Al Khalifa and to the Prime Minister Shaikh Khalifa bin Salman Al Khalifa, on the death of Shaikh Faisal bin Hamad Al Khalifa.")); *id.*, Ex. 17 (Campbell Clark, *Abbas' son seeking more political, financial backing*, THE GLOBE & MAIL, July 6, 2007 at A4 ("Yasser Abbas, acting as an emissary of his father, met with senior officials and two cabinet ministers [in Canada] to push for the speedy resumption and expansion of aid . . . .")); *id.*, Ex. 18 (*2012 to witness consulate of Kazakhstan in Palestine*, KAZINFORM, (Apr. 9, 2012), http://inform.kz/eng/article/2454131 ("In October 2008, Yasser Abbas, the Special Envoy of the Head of Palestinian National Authority Muhammad Abbas visited Kazakhstan.")).

Moreover, Yasser Abbas has not shied away from at times holding himself out as a kind of de facto spokesperson for his father, including on economic and political matters, and touts his access to government officials. *Id.*, Ex. 13 (Faucon Article ("Abbas' tirade shouldn't be shrugged off, for his influence on his father is strong – he even advises on the appointment of some ministers. . . . . Asked if his views on free markets are shared by the new Palestinian chairman, he says: 'Yes.  You can consider these statements to be his.'")); *id.*, Ex. 6 (*Abbas Interview, Part 4: On the separation of powers in Ramallah,* http://un-truth.com/middle-east-peace-process/on-the-separation-of-powers-in-ramallah ("But I know, I know for the President's point of view that he gives the authority to the Prime Minister . . . .  President Abbas is not like Yasser Arafat – he never takes any professional differences personally."); *id.* (*Abbas Interview, Part 3* ("I will call my friend in the Energy Authority, the PEA, and I can get exactly the number (amount) of the damage . . . .")).  *See also id.*, Ex. 19 (Campbell Clark, *PM opposes Palestinian statehood bid*, GLOBE & MAIL, Sept. 21, 2011, at A1 ("[Yasser] Abbas . . . expressed bitter

disappointment that Canada is 'not supporting the Palestinian cause' but said he didn't raise it with [Canada's foreign Affairs Minister John Baird]. Instead, he said, he reminded the foreign minister that his father has invited him to Ramallah in the West Bank. 'I told him it's something he should take seriously,' Mr. Abbas said."). Moreover, Yasser Abbas's political involvements have not been without controversy. *E.g., id.*, Ex. 20 (Khaled Abu Toameh, *et al.*, *Palestinians deny secret talks with Israel*, THE JERUSALEM POST, Sept. 23, 2003, at 2 ("Yasser Abbas . . . on Monday denied a newspaper report that claimed he was participating in secret negotiations with Israel at the Rockefeller resort in New York.")).

**D.**     **The Controversy Surrounding Yasser Abbas's Dual Roles**

Not surprisingly, almost immediately after Yasser Abbas moved to the Palestinian territories and began to enjoy rapid business success, the press around the world took note, began reporting about it, and began raising questions about whether there was a connection to his political lineage. Indeed, unlike the Commentary at issue here, many commentators assumed, rather than merely questioned, the existence and impropriety of such a connection. *See* Jones Decl. Ex. 21 (*The Palestinians Need Money Like Yasser Needs Chutzpah*, THE NEW YORK POST, at 030, Dec. 1, 1998 ("Every industry in the PA-controlled areas is a monopoly controlled by an [Yasser] Arafat henchman . . . electronics are controlled by Yasser Abbas . . .")); *id.*, Ex. 22 (Jean-François Legrain, *The Successions of Yassir Arafat*, 28 J. PALESTINE STUD. 4, Summer 1999, at 5, *available online at*

http://www.palestine-studies.org/journals.aspx?id=2556&jid=1&href=fulltext (discussing Mahmoud Abbas as a potential successor to Arafat and noting "[h]is vast new residences in Gaza and Ramallah have not helped quell the widespread suspicions of corruption concerning him and his children")); *id.*, Ex. 23 (Robert Terris & Vera Inoue Terris, *Case Study of Third World*

*Jurisprudence-Palestine: Conflict Resolution and Customary Law in a Neopatrimonial Society*,
20 BERKLEY J. INT'L L. 462, 481 & n.112 (2002) ("At present, there is usually only one supplier
from whom the populace can buy imported goods . . . .  These monopolies also filter down to the
children of Arafat confidantes.  For instance, Paltech, an importer of consumer electronic
entertainment (such as television and VCRs) is owned by Yasser Abbas. . . .")); *id.*, Ex. 24 (Ike
Seamans, *What do Palestinians Do With Humanitarian Aid Money?*, THE MIAMI HERALD, Jan.
25, 2003, at 7B ("Israeli military intelligence charges that Yasser Arafat and his cronies have $20
billion stashed in Swiss bank accounts and invested in foreign real estate.  With PA financial
help, Yasser Abbas, the prime minister's son, joined the gravy train.  He has gained control of
the electronics industry, even though he's a Canadian citizen who lives in Ramallah only a few
months a year.")); *id.*, Ex. 25 (Khaled Abu Toameh, *Abbas takes son on official visit to Qatar*,
THE JERUSALEM POST, Feb. 22, 2009, at 2 ("PA officials in Ramallah refused over the weekend
to comment on the fact that Yasser Abbas had accompanied his father on a visit to Qatar last
week . . . .  'There are many Palestinian businessmen who would love to do business with the
Qataris and other Gulf countries,' the [Fatah] operative said.  'Why didn't our president take
with him a delegation of businessmen?'")); *id.*, Ex. 26 (*Abbas Could Be Next Domino to Fall*,
NEWSTEX WEB BLOGS – INTERNATIONAL PROJECT ON TERRORISM (Oct. 7, 2011, 3:23 PM EST)
("There are also questions about the extraordinary wealth accumulated by Mahmoud Abbas'
sons, Yasser and Tarek.")); *id.*, Ex. 13 (Faucon Article ("Yasser Abbas joined the A-list of the
sons of Middle-Eastern leaders, most of them capitalists, who influence their fathers' economic
policies.")); *id.*, Ex. 27 (Adam Entous, *Firms run by President Abbas's sons get U.S. contracts*,
REUTERS (Apr. 22, 2009), http://uk.reuters.com/article/2009/04/22/uk-palestinians-aid-abbas-
exclusive-sb-idUKTRE53L2R020090422 ("U.S. support for President Abbas, including

hundreds of millions of dollars in aid for Palestinians, and the business dealings of his sons and closest advisers are sensitive issues in the Palestinian territories, where joblessness more than doubled after the outbreak of a Palestinian uprising in 2000.")).

E.     **Yasser Abbas's Participation in These Controversies**

Yasser Abbas has long recognized the widespread existence of questions about his business ventures, political advocacy and possible nepotism, and has taken to the press in an effort to respond to them long before the publication of the Commentary at issue here – both to defend himself personally, and to defend his father's government in response to questions about broader corruption in the PA.

First, Abbas has vocally denied any suggestion that his business success has anything to do with his familial ties or his political activities.  *See* MTD Mem. at 22-24; Jones Decl. Ex. 13 (Faucon Article ("But Abbas is quick to deny that his parentage helped him gain financial advantage.  'I never received any money from the PLO or the Palestinian Authority, not a penny,' he says.")).  In fact, when in 2009 Abbas gave a very lengthy interview with journalist Marian Houk of the website *UN-truth*, which calls itself a blog focused on the Israeli-Palestine conflict, the very first question that Houk asked him concerned this issue:

> (Marian Houk) Question: In every country in the world, of course, Presidents, and leaders have relatives who make their living.  But the question is – your position gives you so much more influence, how do you decide, for you what's ethical, and what's not ethical? How do you make these decisions?  How do you decide how you're going to function.
>
> (Yasser Abbas) Answer:  Well, first of all, the first company that I've ever established in my life – no, it's not the first company, I established one in Canada, but maybe the second company I established in my life was in Palestine, in Ramallah, in 1996. When Mahmoud Abbas was not the President, not the Prime Minister.  He was Secretary-General of the PLO.  I decided to open a company, and go and compete like any other company in the market. . . .  I can claim that all my projects that I take are

> competitive bidding.  Nobody has any privilege to me, personally,
> to come and tell me, 'I will give you this', or 'I will give you that.'

*Id.*, Ex. 6 (*Yasser Abbas Interview, Part 1*).

Finally, Abbas has undertaken to publicly deny that there is any issue with PA corruption

at all, while at the same time acknowledging that a controversy on this topic has long existed:

> Well, you know, I mean, we are really confused over how the
> world, they want to look at us.  As far as the government is
> concerned, for the past 13, 14 years, we have been stamped with
> corruption.  Until now, wherever we go, they talk about our
> corruption.  And they know, deep inside, that this cracked [broken]
> record, in my terminology, has been played all around these years.
> But, whoever you talk about, they're like all my visits sometimes
> to the U.S., they still talk about corruption.  They are still talking
> that four years ago.  And we keep telling them, our government has
> no corruption.  OK.  Our government has no corruption.

*Id.* (*Yasser Abbas Interview, Part 3*).

## F.     Yasser Abbas's Persistent Use of Litigation and Threats of Litigation Against His Critics

More recently, rather than let his responses in the public arena speak for themselves,

Yasser Abbas has turned to regularly threatening and instituting defamation litigation in an effort

to punish and prevent such questions from even being raised.  To make sure other potential

critics get the message, he openly touts these threats and lawsuits.  In 2008, Yasser and his

brother Tarek reportedly sued the Israeli television station Channel 1 alleging that the station

aired a false report that the brothers own a major portion of the Palestinian cell phone company.

*E.g.*, Jones Decl. Ex. 28 (*Palestinian leader's son sue Israeli TV over cell phone report*, BBC,

Mar. 19, 2008).  The brothers reportedly claimed that the broadcast defamed them and their

father by stating that the elder President Abbas applied pressure on Israeli Prime Minister Ehud

Olmert to approve the use of certain frequencies for the new company.  *Id.*  Again in 2009,

Yasser Abbas publicly threatened to sue Reuters over one of the very news reports that serves as

a source for the Commentary at issue here.  *See id.*, Ex. 29 (Olah Madhoun, *Abbas's sons repair roads and US public image*, MENASSAT (Apr. 29, 2009), http://www.menassat.com/?q=en/news-articles/6453-abbas).  And in 2010, Yasser and his brother allegedly sued—or threatened to sue—the Al-Jazeera network and one of its anchors and political analysts for defamation for a program discussing the United Nations' investigation of the Gaza War.  *Id.*, Ex. 30 (*Middle East Focus:  Middle East Nepotism: Abu Mazen's Sons Go to Court, Again*, ARABIA DESERTA, (Jan. 17, 2010, 10:23 AM), http://arabiadeserta.com/2010/01/17/middle-east-nepotism-abu-mazens-sons-go-to-court-again.aspx).  According to the letter that threatened this lawsuit, Abbas has even sued or threatened to sue Richard Falk, the United Nations' Special Rapporteur for the Palestinian Territories.  *Id.*, Ex. 34 at 4.

## G.    Foreign Policy Magazine

FP is an online and print publication that is a self-described forum for "international news and opinions," covering topics on global politics and economics.  *See generally* http://www.foreignpolicy.com/.  FP won the 2009, 2007 and 2003 National Magazine Award for General Excellence.  *Id.*  FP regularly publishes opinions from all sides of the political spectrum on a variety of international issues, including multiple perspectives on issues touching Israel and/or the Palestinian Authority.  *See, e.g.*, Jones Decl. Ex. 31 (Stephen M. Walt, *What's Going on in Israel?*, FOREIGN POLICY (July 12, 2012, 1:19 PM), http://walt.foreignpolicy.com/posts/2012/07/12/the_veil_falls ("One of the more enduring myths in the perennial debate on the Israel-Palestine conflict is the claim that Israel has always been interested in a fair and just peace, and that the only thing standing in the way of a deal is the Palestinians' commitment to Israel's destruction.")); *id.*, Ex. 32 (Aisling Byrne, *Building a police state in Palestine*, FOREIGN POLICY (Jan. 18, 2011, 6:29 PM),

http://mideast.foreignpolicy.com/posts/2011/01/18/building_a_police_state_in_palestine ("But a police state is what is being assiduously constructed in Palestine, disguised as state-building and good governance.  Under this guise, its intent is to facilitate the authoritarianism which creates sufficient popular dependency – and fear – to strangle any opposition.")).  One section of FP's web publication is entitled "Arguments," which the publication describes in this way: "Polemical, controversial, and powerful, FP arguments provide timely insight on stories making headlines around the world."  http://www.foreignpolicy.com/about_us.  The Commentary at issue in this case is labeled "Argument," and indeed may be accessed by clicking onto the link on FP's website labeled "Arguments."

http://www.foreignpolicy.com/category/section/argument?page=14.

## H.   Dr. Jonathan Schanzer and the Commentary

Dr. Schanzer is Vice President for Research at Foundation for Defense of Democracies ("FDD"), a non-partisan institution focusing on national security and foreign policy.  *See generally* http://www.defenddemocracy.org/about-fdd;  Declaration of Jonathan Schanzer ("Schanzer Decl.") at ¶ 1.  Prior to joining FDD, Dr. Schanzer worked as a terrorism finance analyst at the U.S. Department of the Treasury, and for several other U.S.-based think tanks, including the Washington Institute for Near East Policy, the Jewish Policy Center, and the Middle East Forum.  *Id.* at ¶ 2.  Dr. Schanzer has published two books, *Hamas v. Fatah:  The Struggle for Palestine* (2008) and *Al-Qaeda's Armies: Middle East Affiliate Groups and the Next Generation of Terror* (2004).  *Id.* at ¶ 4.  From time to time, Dr. Schanzer publishes articles in the American and international media on Middle Eastern political and economic topics, including several in FP prior to the publication at issue here.  *Id.* at ¶ 5.

On June 5, 2012, FP published Dr. Schanzer's report titled *The Brothers Abbas, Are the sons of the Palestinian president growing rich off their father's system?* (the "Commentary"). *See* MTD Mem. at 1.  The Commentary includes approximately thirty-one words or phrases that are hyperlinked to various previously published articles or sources.  The entire collection of articles the Commentary links to is attached to the contemporaneously filed Motion to Dismiss as Ex. B.

Within a week of the Commentary's publication, in an interview with the independent Palestinian news agency Ma'an, Abbas publicly threatened to sue FP and openly touted his other lawsuits against "similar defamation campaigns."  Jones Decl. Ex. 33 (*Abbas son says* [sic] *to sue US magazine over wealth claims*, MA'AN NEWS AGENCY (June 12, 2012, updated June 13, 2012, 13:37), http://www.maannews.net/eng/ViewDetails.aspx?ID=494599).  Curiously, shortly after the article's publication, Dr. Schanzer noticed that several of the hyperlinked sources for the Commentary were taken down, including Yasser Abbas's own biography for his company First Option Construction Management and an article published by the Toronto Star.  Schanzer Decl. ¶ 6.  The biography recovered as cached Internet webpages and the Toronto Star article are attached to the contemporaneously filed Motion to Dismiss as Ex. B.

On July 23, 2012, a London-based counsel for Plaintiff sent FP a letter requesting that FP remove the Commentary in its entirety and retract certain portions of the Commentary that Plaintiff alleged were defamatory and false.  Jones Decl., Ex. 34.  The letter vaguely threatened a lawsuit(s) in any of a half-dozen jurisdictions around the world.  *Id.* at 4.  On August 6, 2012, FP responded by explaining why it did not find any of Abbas's complaints to allege anything defamatory or materially false in the Commentary, but offered to clarify any facts in the Commentary if Abbas would provide it the basis to do so, and further offered him the

opportunity to publish a response to the Commentary.  Jones Decl. Ex. 35 (Letter from James

McLaughlin, Esq., Washington Post Media to Rupert Earle, Esq., Bates Wells & Braithwaite

London LLP (Aug. 6, 2012) at 7).  Abbas' counsel declined the invitation, *id.*, Ex. 36 (Letter

from Rupert Earle, Esq. to James McLaughlin, Esq. (Aug. 21, 2012)), and on September 20,

2012 Plaintiff filed the instant complaint in this action.

## I.      Congressional Investigation of U.S. Aid to the Palestinian Authority

In addition to the Commentary, the complaint also notes two instances of testimony

provided to Congress by Dr. Schanzer.  While not separately challenged in the complaint, this

testimony forms a principal basis for Plaintiff's theory of actual malice, because he alleges that

Dr. Schanzer's testimony is consistent with the contents of the Commentary.

The Palestinian Authority is a significant recipient of U.S. foreign aid, which must be

appropriated annually by Congress.  On September 14, 2011, the U.S. House Committee on

Foreign Affairs held a hearing entitled "Promoting Peace? Reexamining U.S. Aid to the

Palestinian Authority," which was held as "part of a broader oversight by the committee to

examine U.S. assistance to the Palestinian Authority and U.S. policy options to address the

troubling turn of events regarding the PA's activities."  *See Promoting Peace?  Reexamining*

*U.S. Aid to the Palestinian Authority, Part II:  Hearing Before the H. Comm. on Foreign Affairs*,

112th Cong. 112-68 (2011) *available at* http://foreignaffairs.house.gov/hearings/view/?1350.

Dr. Schanzer, along with several other Middle Eastern affairs experts testified at the hearing

regarding these issues.  *Id.*

On July 10, 2012, the U.S. House Subcommittee on the Middle East and South Asia of

the Committee on Foreign Affairs held another hearing entitled "Chronic Kleptocracy:

Corruption within the Palestinian Political Establishment."  The panel again included Dr.

Schanzer and several of the same Middle Eastern experts who testified at the September 2011

hearing.  *Chronic Kleptocracy:  Corruption within the Palestinian Political Establishment*,

*Hearing before the Subcomm. on the Middle East and South Asia of the H. Comm. on Foreign*

*Affairs*, 112th Cong. 112-167 (2012) *available at*

http://foreignaffairs.house.gov/hearings/view/?1454.

## ARGUMENT

I.    **ABBAS'S COMPLAINT SHOULD BE DISMISSED UNDER THE PROTECTION CONFERRED BY THE DISTRICT OF COLUMBIA'S ANTI-SLAPP STATUTE.**

The District of Columbia's Anti-SLAPP statute, D.C. Code § 16-5501 *et seq*. ("the Act"),

provides a substantive protection from defamation lawsuits, such as this one, arising out of "acts

in furtherance of the right of advocacy on issues of public interest," which Abbas can overcome

only by satisfying the heavy burden of demonstrating to this Court that he is "*likely* to succeed

on the merits" of his claims.  Because Abbas is unable to meet his burden, the Act requires his

complaint be dismissed, promptly and with prejudice.

A.    **The Anti-SLAPP Act's Protection Applies To This Action.**

The terms of the protection conferred by the Anti-SLAPP Act are unambiguous, and their

application to the facts of this case is straightforward.  The operative provisions of the Act

insofar as they relate to this motion are set forth in Section 16-5502, which provides:

> (a) A party may file a special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public interest within 45 days after service of the claim.

> (b) If a party filing a special motion to dismiss under this section makes a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest, *then the motion shall be granted* unless the responding party demonstrates that the claim is likely to succeed on the merits, in which case the motion shall be denied.

19

D.C. Code § 16-5502 (emphasis added).  The Act further provides that, "[i]f the special motion to dismiss is granted, dismissal shall be with prejudice."  *Id*.  In other words, Defendants bear the burden on this motion of showing only that Abbas's claims arise from the type of advocacy protected by the Act.  If so, then the Act *requires* that the complaint be dismissed *with prejudice*. The only exception to the protection thus conferred is in the circumstance in which a plaintiff such as Abbas meets the heavy burden imposed by the Act of proving that he is *likely* to succeed on the merits of his claims.

There can, moreover, be no question that D.C.'s Anti-SLAPP Act applies to Abbas's claims.  Indeed, the Act's legislative history confirms that the legislation is designed to put an end to just such lawsuits aimed at stifling speech about matters of public concern:

> Such lawsuits, often referred to as strategic lawsuits against public participation – or SLAPPs – have been increasingly utilized over the past two decades as a means to muzzle speech or efforts to petition the government on issues of public interest.  Such cases are often without merit, but achieve their filer's intention of punishing or preventing opposing points of view, resulting in a chilling effect on the exercise of constitutionally protected rights.

Jones Decl. Ex. 37 at 1 (Committee Report.).  It would be difficult to find a more compelling example of a "SLAPP" suit than this complaint, which seeks to "muzzle speech" *and* "efforts to petition the government on issues of public interest."

To combat this phenomenon, the Anti-SLAPP Act "incorporates substantive rights with regard to a defendant's ability to fend off lawsuits filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view."  *Id.  See also id.* at 4 (statute "provides a defendant to a SLAPP with *substantive* rights to expeditiously and economically dispense of litigation aimed to prevent their engaging in constitutionally protected actions on matters of public interest") (emphasis added).

20

Because D.C.'s Anti-SLAPP statute confers a substantive protection under District of Columbia tort law, it applies in federal court. *See, e.g.*, *Farah v. Esquire Magazine*, 863 F. Supp. 2d 29, 36 & n.10 (D.D.C. 2012) (invoking decisions of the First, Fifth and Ninth Circuits applying anti-SLAPP statutes as substantive protections of state law and dismissing claims for defamation and related torts under the D.C. Act). As Judge Leon concluded in *Sherrod v. Breitbart*, 843 F. Supp. 2d 83, 85 (D.D.C.), *appeal docketed*, No. 11-7088 (D.C. Cir. Aug. 30, 2012), "the legislative history make[s] clear that the D.C. Anti-SLAPP Act is substantive." As the Court further explained, "the statutory text" also "supports the conclusion that the statute is substantive." *Id.* at 85 n.4. For example, the Act "shifts the burden of proof to the plaintiff to show her claims are likely to succeed" and "'it is long settled that the allocation of [the] burden of proof is substantive in nature and controlled by state law.'" *Id.* (quoting *Godin v. Schencks*, 629 F.3d 79, 89 (1st Cir. 2010)). Similarly, the Act provides for an award of "attorneys' fees and costs to the prevailing party," and "such statutory provisions are substantive in nature" as well. *Id.*; *see also Farah*, 863 F. Supp. 2d at 36 n.10 ("It was certainly the intent of the D.C. Council and the effect of the law . . . to have substantive consequences.").[2]

---

[2] One judge on this court has held that the Act would not apply in federal court, *see 3M Co. v. Boulter*, 842 F. Supp. 2d 85 (D.D.C. 2012), and, although the case had been appealed and consolidated for argument with the appeal in *Sherrod*, the *3M* appeal has now been dismissed. Thus, the D.C. Circuit is expected to first address the SLAPP statute either later this year or early next in connection with appeal of *Sherrod* – and even then may not reach its applicability in federal court given other issues unique to that case, including whether the statute applies retroactively and whether a late-filed SLAPP motion may still be entertained. However, consistent with the reasoning of *Sherrod* and *Farah*, the overwhelming majority of federal courts – including every federal court of appeal to consider the issue – has applied more than a dozen different anti-SLAPP statutes like D.C.'s as substantive protections of state law. *See Godin v. Schencks*, 629 F.3d 79, 91-92 (1st Cir. 2010) (Maine statute); *Chandok v. Klessig*, 632 F.3d 803 (2d Cir. 2011) (if satisfied, New York statute would apply); *Brown v. Wimberly*, 477 F. App'x 214, 216 (5th Cir. 2012) (Fifth Circuit "has adopted the use of the [anti-SLAPP] statute in federal court") (Louisiana statute); *Gardner v. Martino*, 563 F.3d 981, 991 (9th Cir. 2009) (Oregon statute); *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 970-73

### B.      Abbas's Complaint Triggers The Anti-SLAPP Act's Protection.

To invoke the protection afforded by the Act, Defendants need only make "a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest." D.C. Code § 16-5502(b).  It would be surprising, if not frivolous, were Abbas actually to contend that the Commentary somehow fails to qualify as "'an act in furtherance of the right of advocacy on issues of public interest.'"  *See Farah*, 863 F. Supp. 2d at 36-39 (applying Act to blog post critical of group that had questioned "whether President Obama qualifies by birthright to be President") (citations omitted).  In any event, the statutory definition of such an act includes three prongs, any one of which is sufficient to trigger the application of the statute here.

**First**, the Act applies to "[a]ny written or oral statement" made "[i]n connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." D.C. Code § 16-5501(1)(A)(i).   Here, Plaintiff's

---

(9th Cir. 1999) (California statute); *Tennenbaum v. Arizona City Sanitary Dist.*, 799 F. Supp. 2d 1083 (D. Ariz. 2011) (Arizona statute); *Buckley v. DIRECTV, Inc.*, 276 F. Supp. 2d 1271 (N.D. Ga. 2003) (Georgia statute); *Chi v. Loyola Univ. Med. Ctr.*, 787 F. Supp. 2d 797 (N.D. Ill. 2011) (Illinois statute); *Containment Techs. Group Inc. v. Am. Soc. of Health Sys. Pharmacists*, No. 1:07-cv-0997-DFH-TAB, 2009 WL 838549 (S.D. Ind. Mar. 26, 2009) (Indiana statute); *Russell v. Krowne*, No. DKC 2008-2468, 2010 WL 2765268 (D. Md. July 12, 2010) (Maryland statute); *Balestra-Leigh v. Balestra*, No. 3:09-CV-551, 2010 WL 4280424 (D. Nev. Oct. 19, 2010), *aff'd on other grounds*, 471 F. App'x 636 (9th Cir. 2012) (Nevada statute); *Monaco Entm't Grp. v. City of El Paso*, No. EP-11-CV-561-DB (W.D. Tex. Aug. 29, 2012) (Texas statute); *Bible & Gospel Trust v. Twinam*, No. 1:07-CV-17, 2008 WL 5245644 (D. Vt. Dec. 12, 2008) (Vermont statute); *Aronson v. Dog Eat Dog Films, Inc.*, 738 F. Supp. 2d 1104 (W.D. Wash. 2010) (Washington statute).  Moreover, federal courts have not hesitated to apply the anti-SLAPP statutes of states other than the forum's where mandated under applicable choice of law principles.  *See, e.g.*, *USANA Health Scis., Inc. v. Minkow*, No. 2:07-CV-159, 2008 WL 619287, at *3 (D. Utah Mar. 4, 2008); *Mero v. U.S. Figure Skating Ass'n*, No. 2:07-CV-159, 2006 WL 163529, at *6 (E.D. Mich. Jan. 20, 2006); *Global Relief Found. v. New York Times Co.*, No. 01 C 8821, 2002 WL 31045394, at *11 (N.D. Ill. Sept. 11, 2002); *Blumenthal v. Drudge*, No. Civ. A. 97-1968, 2001 WL 587860 (D.D.C. Feb. 13, 2001); *see also Price v. Stossel*, No. 07-Cv. 11364, 2008 WL 2434137 (S.D.N.Y. June 4, 2008) (finding application of California statute was factor in transferring case).

complaint confirms that the "United States Congress House [Committee] on Foreign Affairs" held hearings on "the topic of U.S. Aid to Palestinians." Compl. ¶ 57.  Specifically, as plaintiff concedes, the Committee heard testimony on September 14, 2011 from Dr. Schanzer, allegedly advising Congress that one "worthwhile inquiry would explore the way in which Abbas' sons, Yasser and Tarek, have accumulated wealth since their father took office in 2005."  Compl. ¶¶ 57-61; *see also id.* ¶ 64-65 (describing Committee testimony recommending that Congress "[c]onduct an inquiry into the personal wealth of Mahmoud Abbas and his sons, Yasser and Tarek, to determine whether US funds have contributed to their personal holdings").  As plaintiff's complaint also concedes, this issue continued to be under consideration and review by the Congress, when the House Subcommittee on the Middle East convened additional hearings in July 2012, after the Commentary was published.  *Id.* ¶¶ 67-74.  The complaint then proceeds to articulate a theory of liability for actual malice as to the Commentary that explicitly hinges upon the contents of Dr. Schanzer's Congressional testimony, and so plainly meets this statutory definition.

More broadly, the Commentary begins by noting that "In the wake of the Arab Spring, U.S. leaders have promised to reverse the United States' long reliance on autocratic, unrepresentative leaders who enrich themselves at the expense of their citizens," and then proceeds to raise questions about whether members of the Abbas family belong in this category. It is obvious to even the most casual observer that, in addition to Congress, the Department of State and other executive branch agencies devote substantial attention to reviewing and as necessary refining U.S. foreign policy throughout the Middle East, particularly in connection with Israel and the Palestinian Authority.  Given that this issue has been under consideration and

review by both the Executive and Legislative branches, a Commentary directly addressing such

an issue meets this statutory definition and thus triggers the protection conferred by the Act.

**Second**, the statute defines an "[a]ct in furtherance of the right of advocacy on issues of

public interest" to include a "written or oral statement" made in "a place open to the public or a

public forum in connection with an issue of public interest."  D.C. Code § 16-5501(1)(A)(ii).

&(B).  As Judge Collyer concluded in *Farah*, an Internet post, such as the one at issue here,

qualifies as a "'written . . . statement'" made in a "'place open to the public or a public forum.'"

*Farah*, 863 F. Supp. 2d at 38 (quoting D.C. Code § 16-5501 (1)(A)).  With respect to the second

part of the definition, the Act defines "[i]ssue of public interest" to include, *inter alia*, (a) "an

issue related to . . . safety [or] economic, or community well-being" or (b) "an issue related to

. . . a public figure."  D.C. Code § 16-5501(3).  A piece of commentary that addresses one of the

U.S.'s key partners in seeking peace in the Middle East, which directly affects U.S. national

security, and asks whether plaintiff and his brother have "enriched themselves at the expense of

. . . U.S. taxpayers," particularly when the very issue of U.S. foreign aid to the PA has been the

subject of Congressional hearings, indisputably involves "an issue related to . . . safety [or]

economic or community well-being."  *See, e.g.*, *United States v. El-Mezain*, 664 F.3d 467, 487-

88 (5th Cir. 2011) (providing material assistance to Hamas, ruling party in Gaza Strip, would

"'disrupt the Middle East peace process'" and would therefore "'constitute an unusual and

extraordinary threat to the national security, foreign policy and economy of the United States'")

(quoting Exec. Order No. 12947, 1995 WL 25760 (Pres. Exec. Order, issued Jan. 23, 1995)),

*cert. denied*, --- S. Ct. --, 2012 WL 1835124 (Oct. 29, 2012).

Similarly, Defendants' Motion to Dismiss demonstrates that plaintiff is a public figure

– and therefore triggers the Anti-SLAPP Act – based on the complaint and the materials it

references, noting *inter alia* plaintiff's role as a "'special envoy'" and his substantial official "'work on behalf of the Palestinian people.'"  *See* MTD Mem. at 24 (quoting Compl. ¶¶ 40, 43). This conclusion is further supported when the additional public record, submitted with this motion, is considered.  Under the three-part test of *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980), plaintiff is unquestionably a public figure because:

(a) There is a pre-existing controversy about both allegations of corruption in the Palestinian Authority in general and allegations of corruption and/or nepotism by the Abbases specifically.  This issue has been the subject of widespread reports and commentary in publications around the globe, not to mention hearings in the United States Congress, all prior to the publication of the Commentary at issue.  *See* Statement of Facts, Parts B, D & I *supra*.

(b) Abbas has thrust himself into this controversy over allegations about the Palestinian Authority by representing both its government and his father, its president, and by repeatedly taking to the press to address concerns about his business ventures, his political advocacy and possible nepotism.  *See* Statement of Facts, Parts C & E *supra*.

(c) The Commentary is germane to Plaintiff's participation in the public controversy because the questions it raises directly address his wealth, whether its results from his lineage, whether those circumstances could affect U.S. foreign policy, and whether U.S. funds might be misspent in the region.  *See* Statement of Facts, Part H *supra* & MTD Mem. Ex. A (Commentary).

**Third,** the statute defines an "[a]ct in furtherance of the right of advocacy on issues of public interest" to include "expression or expressive conduct that involves petitioning the government or communicating views to members of the public in connection with an issue of

public interest." D.C. Code § 16-5501(1)(B). Simply put, if publishing an article posted in a major publication like FP about key partners in the Middle East is not "expressive conduct that involves communicating views to members of the public" in connection with an issue of public interest, it is difficult to imagine what would be.

> **C.     To Overcome the Statutory Protection and Avoid Dismissal, Abbas Must Demonstrate that He is Likely to Succeed on the Merits of His Claims.**

Having satisfied their burden of showing that Abbas's claims "arises from an act in furtherance of the right of advocacy on issues of public interest," the Act unambiguously provides that Defendants' special motion to dismiss "shall be granted," and with prejudice. D.C. Code §§ 16-5502(b) & (d). Defendants need do nothing more to obtain the requested relief. Abbas may avoid that result only by carrying the heavy burden imposed on him by the Act of successfully demonstrating that his claims are "*likely* to succeed on the merits." *Id.* (emphasis added); *see Farah*, 863 F. Supp. 2d at 39 (granting anti-SLAPP motion where defendants "made a prima facie showing that the [claims] arose from speech in furtherance of the right of advocacy on issues of public interest and Plaintiffs have failed to demonstrate that their claims are likely to succeed on the merits"). Because, as demonstrated *infra*, Abbas is unable to carry his burden under the Act, Defendants are fully entitled to shelter under the protection it confers.

**II.     ABBAS CANNOT CARRY HIS BURDEN OF DEMONSTRATING HE IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS.**

For each of the reasons set forth in Defendants' Motion to Dismiss, Abbas is unable to demonstrate that he is likely to succeed on the merits of his claims. "Unlike in the Rule 12(b)(6) Motion – where [plaintiff] is entitled to certain inferences – here, [he] bears the burden of demonstrating that [his] claims are likely to succeed.'" *Sherrod*, 843 F. Supp. 2d at 85 n.4 (citation omitted).

As discussed in greater detail in the Memorandum in support of Defendants' Motion to Dismiss, the Commentary is not actionable for each of the following independent reasons:

- Plaintiff's complaint is expressly premised on the allegation that Defendants "defamed plaintiff by posing libelous questions," Compl. ¶ 38, which do not qualify as a statement of fact that can be proven true or false.  *See, e.g.*, *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993).  *See also* MTD Mem. at 4-7.

- Any defamatory implication from the questions Abbas takes issue with is a constitutionally protected expression of opinion.  *See, e.g.*, *Ollman v. Evans*, 750 F.2d 970, 983, 987 (D.C. Cir. 1984) (en banc).  *See also* MTD Mem. at 9-11.

- The individual statements Abbas challenges are either not capable of a defamatory meaning, *see, e.g.*, *White v. Fraternal Order of Police*, 909 F.2d 512, 519 (D.C. Cir. 1990); not materially false, *see, e.g.*, *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991); or not "of and concerning" the Plaintiff, *see, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 288 (1964).  *See also* MTD Mem. at 13-21.

- Abbas is a public figure who has failed to plead facts that would support a finding of actual malice – or even negligence – against either defendant.  *See, e.g.*, *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 154-55 (1967).  *See also* MTD Mem. at 21-32; Statement of Facts Parts B, C, D, E, H & I and Argument Part I.B. *supra* (setting forth additional facts confirming Plaintiff's status as a public figure subject to the requirement to establish actual malice).

Indeed, the facts set forth in this motion merely buttress what is already fully set forth in Defendants' Motion to Dismiss, that Plaintiff's complaint is repeatedly premised upon reading alleged words and implications into the Commentary that are not there, or playing semantic games with those that are.  For example, Plaintiff alleges that the words "a monopoly over the sale of U.S. made cigarettes" are false, because (1) he concedes that he owns an exclusive market right, the plain meaning of the word, but then argues that the Commentary claimed a government-awarded privilege, which it does not; and (2) he construes the word "made" to literally mean "place of manufacture" as opposed to "brand" (even though linked-to articles make clear it is the latter), and then claims the statement is false because the American-branded cigarettes he distributes are allegedly actually manufactured in Turkey.  It would be difficult to come up with a better example of a distinction without a difference.  Similarly, the facts make clear that Abbas's political activities are actually far more extensive and significant than the single trip to Kazakhstan the Commentary mentions.

For each of the above reasons, Abbas cannot carry his burden of demonstrating that he is likely to succeed on the merits of his claims.  Accordingly, under the D.C. Anti-SLAPP Act, his claims must be dismissed with prejudice.

## CONCLUSION

In the final analysis, the Commentary falls well within the protections of both the First Amendment and the common law.  Without robust protection for commentary and questioning of such core issues, courts will face a "stream of libel actions," which are "as much designed to punish writers and publications as to recover damages for real injuries" and which will "threaten the public and constitutional interest in free, and frequently rough, discussion."  *Ollman*, 750 F.2d at 993 (Bork, J., concurring).  Applying these principles, the District of Columbia has

sought to place substantive limits on defamation claims that would chill or punish such speech by enacting the Anti-SLAPP Act. "Because this suit arises from Defendants' speech on matters of public interest" and Plaintiff cannot demonstrate a likelihood of success on the merits of his claims, "the suit must be dismissed." *Farah*, 863 F. Supp. 2d at 38.

Dated: November 5, 2012                    Respectfully submitted,

By: ___/s/ Kevin T. Baine_____       By: ___/s/ Nathan E. Siegel_____

WILLIAMS & CONNOLLY LLP             LEVINE SULLIVAN KOCH & SCHULZ, LLP

Kevin T. Baine (Bar No. 238600)          Nathan E. Siegel (Bar No. 446253)
Adam Tarosky (Bar No. 983920)            Seth D. Berlin (Bar No. 433611)
Elise Borochoff (Bar No. 1006246)        Shaina D. Jones (Bar No. 1002801)


725 Twelfth Street, NW                   1899 L Street, NW
Washington, DC 20005                     Suite 200
Telephone: (202) 434-5000                Washington, DC  20036
Facsimile: (202) 434-5029                Telephone: (202) 508-1100
                                         Facsimile: (202) 861-9888
kbaine@wc.com
atarosky@wc.com                          nsiegel@lskslaw.com
eborochoff@wc.com                        sberlin@lskslaw.com
                                         sjones@lskslaw.com

*Counsel for Defendant Foreign Policy*   *Counsel for Defendant Jonathan Schanzer*
*Group, LLC*

29

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of November 2012, I served the foregoing

**DEFENDANTS' SPECIAL MOTION TO DISMSS THE COMPLAINT PURSUANT TO**

**THE D.C. ANTI-SLAPP ACT, MEMORANDUM OF POINTS AND AUTHORITIES IN**

**SUPPORT THEREOF, DECLARATION OF JONATHAN SCHANZER,**

**DECLARATION OF SHAINA D. JONES (AND EXHIBITS THERETO), and**

**PROPOSED ORDER** via the Court's CM/ECF system, upon:

> S. Dwight Stephens, Esq.
> Louis G. Adolfsen, Esq.
> Rania Shoukier, Esq.
> Michael F. Panayotou, Esq.
> MELITO & ADOLFSEN P.C.
> 233 Broadway, Suite 1010
> New York, New York 10279
>
> *Counsel for Plaintiff*

/s/ Nathan E. Siegel
 Nathan E. Siegel