**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ──────────────────────── | ) |
| YASSER ABBAS, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | ) Civ. Action No. 12-1565 (EGS) |
| | ) |
| FOREIGN POLICY GROUP, LLC, | ) |
| JONATHAN SCHANZER, | ) |
| | ) |
|     Defendant. | ) |
| ──────────────────────── | ) |

**MEMORANDUM OPINION**

Plaintiff Yasser Abbas brings this defamation action against Foreign Policy Group and Jonathan Schanzer, the author of an article that appeared in Foreign Policy Magazine in June 2012. Pending before the Court are defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and special motion to dismiss pursuant to the District of Columbia Anti-Strategic Lawsuits Against Public Participation Act of 2010 (the "Anti-SLAPP Act"), D.C. Code § 16-5502(a) (2012). Upon consideration of the motions, the responses and replies thereto, the amicus brief filed by the District of Columbia, the applicable law, and the entire record, the Court **GRANTS**

defendants' special motion to dismiss and **DENIES** defendants'

motion to dismiss pursuant to rule 12(b)(6) as moot.[1]

I.    **BACKGROUND**

   A.  **Yasser Abbas**

      Yasser Abbas ("Plaintiff" or "Mr. Abbas") is the son of

Mahmoud Abbas ("M. Abbas"), the President of the Palestinian

Authority (the "PA").  Compl. ¶ 9.  He owns and operates many

businesses throughout the Middle East:  he is the chairman of

Falcon Holding Group, which owns Falcon Global

Telecommunications Services Company, Falcon General Investment

Company, and Falcon Electrical Mechanical Company, an

engineering company with offices in Gaza, Jordan, Qatar, the

United Arab Emirates, and the West Bank that has done work for

USAID in the past, Compl. ¶¶ 21, 28; he is the owner of Falcon

Tobacco, Compl. ¶ 16; he is the chairman of the publicly traded

Al-Mashreq Insurance Company, Compl. ¶ 31; and he is the

managing director of the First Option Project Construction

Management Company, which has offices in Amman, Tunis, Cairo,

Montenegro, and Ramallah and has been awarded USAID funds.

Compl. ¶ 32.

      Mr. Abbas also serves as a political emissary for his

father's regime, and often travels to other countries and

---

[1] Because granting the Anti-SLAPP motion disposes of the entire action, the Court need not consider the motion to dismiss pursuant to Rule 12(b)(6) here.

international meetings in this capacity.  Anti-SLAPP Mot. at 9-
10 (citing Anti-SLAPP Mot., Jones Decl. Ex. 15, 16, 17, 18).  He
has previously acknowledged that his political involvement in
the Palestinian Authority and his business success have
engendered controversy.  *See, e.g.* Anti-SLAPP Mot., Jones Decl.
Ex. 6, Excerpts from an interview with Yasser Abbas in Ramallah
("Yasser Abbas Interview"), Part 3.  Over the last few years,
many questions have been raised about whether his business
success and political ties are linked, though he has
systematically denied any such allegations.  Anti-SLAPP Mot. at
11-12; *see, e.g.,* Jones Decl., Ex. 24 (Ike Seamans, *What do
Palestinians Do With Humanitarian Aid Money?*, THE MIAMI HERALD,
Jan. 25, 2003, at 7B ("Israeli military intelligence charges
that Yasser Arafat and his cronies have $20 billion stashed in
Swiss bank accounts and invested in foreign real estate.  With
PA financial help, Yasser Abbas, the prime minister's son,
joined the gravy train.  He has gained control of the
electronics industry, even though he's a Canadian citizen who
lives in Ramallah only a few months a year.")); *see also* Jones
Decl., Ex. 21, 22, 25, 26.

As public scrutiny over his business and political activity
has increased, Mr. Abbas has used the threat of defamation
litigation to counter bad press.  Anti-SLAPP Mot. at 14-15.
Between 2008 and 2010, Mr. Abbas and his family have filed

defamation lawsuits or threatened to sue for libel on three
separate occasions against an Israeli television channel,
Reuters, and Al-Jazeera.  *Id.*  Mr. Abbas has also threatened to
sue Richard Falk, the United Nations Special Rapporteur for the
Palestinian Territories.  *Id.*

    **B.   Foreign Policy Magazine and Jonathan Schanzer**

    Foreign Policy is an online and print publication is a
"forum for 'international news and opinions' covering topics on
global politics and economics."  Anti-SLAPP Mot. at 15; Compl. ¶
5.  The magazine contains an "Arguments" section, which is
described as:  "Polemical, controversial, and powerful, FP
arguments provide timely insight on stories making headlines
around the world."  Anti-SLAPP Mot. at 16.  Foreign Policy also
publishes FP Arabic on a bimonthly basis in partnership with the
Gulf Strategic Studies Center in Qatar, which contains
translated pieces from Foreign Policy and is distributed in the
Middle East.  Compl. ¶ 7.

    Jonathan Schanzer is the Vice President for Research at the
Foundation for Defense of Democracies ("FDD"), a non-partisan
group that focuses on national security and foreign policy.
Anti-SLAPP Mot., Declaration of Jonathan Schanzer ("Schanzer
Decl.") at ¶ 1.  Prior to joining FDD, Mr. Schanzer worked as a
terrorism finance analyst at the U.S. Department of the Treasury
and at several other U.S. think tanks.  He has also published

two books about Hamas and the Middle East and regularly
publishes articles in American and international publications,
including Foreign Policy.  Schanzer Decl. ¶¶ 2-5.  Mr. Schanzer
has also testified before Congress twice regarding the issue of
corruption in the PA.[2]  *See* Compl. ¶¶ 56-77.

>        **C.    The June 5, 2012 Commentary in Foreign Policy Magazine**

On June 5, 2012, an article (the "Commentary") written by
Mr. Schanzer was published in Foreign Policy magazine.  Compl. ¶
10.  The article is entitled "The Brothers Abbas:  Are the sons
of the Palestinian President growing rich off their father's
system?" and appeared in the "Arguments" section of the
magazine.  It can be accessed by clicking on the "Arguments"
link on the FP website.  *Id.*; Defs.' MTD, Ex. A.  In the
introduction of the article, Mr. Schanzer writes:

> In the wake of the Arab Spring, U.S. leaders have promised
> to reverse the United States' long reliance on autocratic,
> unrepresentative leaders who enrich themselves at the
> expense of their citizens.  There's only one problem: Just
> as top American officials have been making these lofty
> promises, new details are emerging of how close family
> members of Palestinian leader Mahmoud Abbas, a major U.S.
> partner in the Middle East, have grown wealthy.  Have they
> enriched themselves at the expense of regular Palestinians
> – and even U.S. taxpayers?

---

[2] Mr. Abbas describes Mr. Schanzer's Congressional testimony in
the Complaint as evidence of malice on the part of Mr. Schanzer.
Because the Court finds that contested portions of the
Commentary are not defamatory, *see infra* Section II.C.2, the
Court does not reach the question of malice on the part of
Defendants.

Defs.' MTD, Ex. A at 2.  Mr. Schanzer then discusses Mr. Abbas,

his family, and their business and political interests.[3]

Mr. Schanzer does not paint Mr. Abbas or his family in a

particularly flattering light.  He writes of allegations of

corruption in the PA and the "conspicuous wealth" of Mr. Abbas

and his brother, which Mr. Schanzer claims has "become a source

of quiet controversy in Palestinian society since at least

2009."  Defs.' MTD, Ex. A.  He also details allegations made by

some in the region against Mr. Abbas and his family, including

an allegation by Mohammad Rachid, a former economic advisor to

the late PA leader Yasir Arafat who is under investigation for

corruption, that President Abbas has "socked away **$100 million**

in ill-gotten gains."  Defs.' MTD, Ex. A at 2; Compl. ¶ 14.  He

also discusses conversations he had with Palestinians during a

---

[3] In his Complaint, Mr. Abbas alleged that a number of statements
in the Commentary regarding his business interests and political
activity were libelous.  *See* Compl. ¶¶ 14, 16, 21, 22, 28, 30,
32, 35, 37, 39, 41.  However, in his Opposition, Mr. Abbas
considerably narrowed his libel claim and  conceded that "the
article's reference to these businesses is not the basis for
[his] libel claim."  Opp'n to MTD at 10.  In their motion to
dismiss, Defendants addressed these statements and argued that
they were not defamatory.  *See* Defs.' MTD at 15-21.  Therefore,
the Court will treat any allegations of libel relating to these
portions of the Commentary in Plaintiff's complaint as conceded.
*See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284
F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well disputed in this
Circuit that when a plaintiff files an opposition to a
dispositive motion and addresses only certain arguments raised
by the defendant, a court may treat those arguments that the
plaintiff failed to address as conceded.") (citing *FDIC v.
Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997)).

research trip to Ramallah in 2011, who told him that "the Abbas
family dynasty is common knowledge" in the region, but that it
was rarely discussed "thanks to growing fear of retribution by
PA security officers, who have apprehended **journalists and
citizens** for openly challenging President Abbas's authority.
Defs.' MTD, Ex. A at 3; Compl. ¶ 37. The online version of the
article contains approximately 31 highlighted words or phrases
that are hyperlinks to the underlying source material for
statements made in the article, which include articles from
other publications and company websites.[4]   Anti-SLAPP Mot. at
17.

Within a week of the publication of Mr. Schanzer's
Commentary in Foreign Policy, Mr. Abbas threatened to sue the
magazine in an interview with a Palestinian news agency.  Anti-
SLAPP Mot. at 17.  On July 23, 2012, Mr. Abbas's London-based
counsel sent Foreign Policy a letter asking it to remove the
Commentary from its website and retract those portions of the
Commentary that he alleged were defamatory or false.  *Id.*
Foreign Policy responded in a letter dated August 6, 2012,
explaining that it did not read Mr. Abbas's complaints as
alleging anything defamatory or materially false in the
Commentary, and offering to clarify facts in the article if Mr.

---

[4] The bolded words in excerpts of the Commentary in this opinion
represent hyperlinks in the on-line version.

Abbas provided the basis to do so.  Foreign Policy also offered
Mr. Abbas the opportunity to respond in print.  *Id.*  Through his
counsel, Mr. Abbas declined and filed this action on September
20, 2012.  *Id.* at 18.  On November 5, 2012 defendants filed a
motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and a
special motion to dismiss pursuant to the District's Anti-SLAPP
Act.  The District of Columbia moved for leave to file an amicus
curiae brief, which the Court granted.  The District filed an
amicus brief on December 22, 2012 arguing that the Anti-SLAPP
Act is applicable in a federal court sitting in diversity.
These motions are now ripe for determination by the Court.

**II.  Discussion**

    **A.    The Anti-SLAPP Act**

A SLAPP, or strategic lawsuit against public participation,
is a civil action that arises out of a defendant's
communications to government bodies or the public on an issue of
public concern.  *See* Brief of Amicus Curiae District of Columbia
("D.C. Amicus Brief") at 1.  The District's Committee on Public
Safety and the Judiciary has noted that SLAPPs "are often
without merit, but achieve their filer's intention of punishing
or preventing opposing points of view, resulting in a chilling
effect on the exercise of constitutionally protected rights."
Rep. of the D.C. Comm. on Public Safety and the Judiciary on
Bill 18-893 (Nov. 19, 2010) ("Comm. Report")) at 4.  By imposing

8

upon defendants the burden of defending against a lawsuit, the Committee concluded that "litigation itself is the plaintiff's weapon of choice," Comm. Report at 4, one that was "wielded to chill the speech of those who would otherwise speak out on a matter of public interest," D.C. Amicus Brief at 1.  The Committee also found that the impact of these lawsuits was not limited to defendants against whom a suit had been filed, but also prevented others from voicing concerns regarding issues of public concern.  Comm. Report at 4.

To combat this problem, the Council passed the Anti-SLAPP Act in 2010.  The protections offered in the Act "follow[] 'the lead of other jurisdictions, which have similarly extended absolute or qualified immunity to individuals engaged in protected actions'" by enacting similar Anti-SLAPP legislation. *Farah*, 863 F. Supp. 2d at 36 (quoting Comm. Report at 4).  The Act aims to address such concerns "by incorporating substantive rights that allow a defendant to more expeditiously, and more equitably, dispense of a SLAPP."  *Id.*

To that end, the Anti-SLAPP Act provides in pertinent part:

(a) A party may file a special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public interest within 45 days after service of the claim.

(b) If a party filing a special motion to dismiss under this section makes a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion

shall be granted unless the responding party demonstrates
that the claim is likely to succeed on the merits, in which
case the motion shall be denied.

D.C. Code § 16-5502(a)-(b).  The Act also provides that "[i]f

the special motion to dismiss is granted, dismissal shall be

with prejudice."  *Id.*  That is, if the defendant meets the

burden of showing that the claims at issue arise from the type

of activity protected by the Act, the claims must be dismissed

with prejudice unless plaintiff can show a likelihood of success

on the merits.

The Act applies to claims based on any oral or written

statement made:

> (i) In connection with an issue under consideration or
> review by a legislative, executive, or judicial body, or
> any other official proceeding authorized by law; or

> (ii) In a place open to the public or a public forum in
> connection with an issue of public interest.

D.C. Code § 16-5501(1)(A).  It applies to "[a]ny other

expression or expressive conduct that involves petitioning the

government or communicating views to members of the public in

connection with an issue of public interest."  *Id.*  An "issue of

public interest" is defined as one that is "related to health or

safety; environmental, economic, or community well-being; the

District government; a public figure; or a good, product, or

service in the marketplace."  Pursuant to the Act, an "issue of

public interest" "shall not be construed to include private

10

interests, such as statements directed primarily toward protecting the speaker's commercial interests rather than toward commenting on or sharing information about a matter of public significance." *Id.* § 16-5501(3).

In construing the Act, the Court cannot rely on guidance from the D.C. Court of Appeals, which has not yet issued a published opinion interpreting the statute.  Where, as here, "the substantive law of the forum state is uncertain or ambiguous, the job of federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity."  *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d. Cir. 1994).  With this in mind, the Court notes that the Committee Report prepared on the Anti-SLAPP Act emphasized that the statute "followed the model set forth in a number of other jurisdictions." Comm. Report at 1. The D.C. Court of Appeals has accorded great weight to such reports in interpreting other D.C. statutes.  *See, e.g. Dist. of Columbia v. Place*, 892 A.2d 1008, 1113 (D.C. 2006); *Carter v. State Farm Mut. Auto. Ins. Co.*, 808 A.2d 466, 471 (D.C. 2002). Therefore, where necessary and appropriate, the Court will look to decisions from other jurisdictions (particularly California, which has a well-developed body of case law interpreting a similar California statute) for guidance in predicting how the

D.C. Court of appeals would interpret the District's Anti-SLAPP statute. *See Boley*, 2013 U.S. Dist. LEXIS 88494 at *8-9.

### B.   Applicability of the Anti-SLAPP Act in Federal Diversity Actions

The parties dispute whether the District's Anti-SLAPP Act applies in a federal court sitting in diversity.  Defendants contend that because the Act confers substantive protections under the District's tort law, it is applicable in federal court.  Anti-SLAPP Mot. at 21; D.C. Amicus Brief at 5-6. Plaintiff, however, argues that the Anti-SLAPP Act is procedural and thus inapplicable because a federal court must apply federal procedural laws. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); Anti-SLAPP Opp'n at 3-9.

While the applicability of the Anti-SLAPP Act in a federal court sitting in diversity has not been addressed by the D.C. Circuit, other circuits have found that similar state statutes apply in federal court. *See Godin v. Schencks*, 629 F.3d 79 (1st Cir. 2010); *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963 (9th Cir. 1999); *Henry v. Lake Charles Am. Press, LLC*, 566 F.3d 164 (5th Cir. 2009) (adopting the reasoning of the 9th Circuit in *Newsham* and ruling that a similar Louisiana statute was substantive and therefore applied in a federal court).

Most recently, the First Circuit confronted the issue of whether a Maine Anti-SLAPP statute applied in federal court in *Godin v. Schencks* on an interlocutory appeal from a denial of a special motion to dismiss pursuant to the Anti-SLAPP statute. 629 F.3d 79.  Plaintiff in *Godin*, a former public school principal, brought a defamation action against three school system officials because they had expressed their view that she had acted abusively toward students at her school.  629 F.3d at 80-81.  The individual defendants filed a special motion to dismiss under Maine's Anti-SLAPP statute in the district court, which ruled that the statute conflicted with Rules 12 and 56, and therefore did not apply in federal court.  *Id.* at 81-82. The First Circuit reversed the decision of the district court, considering whether the "federal rule is 'sufficiently broad to control the issue before the court,'" and finding that it was not.  *Id.* at 86-87 (citing *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1451 (2010) (Stevens, J., concurring)).  The court held that "neither Fed. R. Civ. P. 12(b)(6) nor Fed. R. Civ. P. 56, on a straightforward reading of its language, was meant to control the particular issues under [the Anti-SLAPP statute] before the district court" and therefore did not reach the question of whether the Rules 12(b)(6) and 56 comply with the Rules Enabling Act.  *Id.* at 86. The Court also concluded that the twin aims of *Erie* –

"discouragement of forum-shopping and avoidance of inequitable administration of the laws," *Hanna v. Plumer*, 380 U.S. 460, 468 (1965), would be "best served by enforcement of [the Anti-SLAPP Act] in federal court," *Godin*, 629 F.3d at 87.   After distinguishing both Rules 12(b)(6) and 56 from the Maine statute, the Court found that "[b]ecause [the Anti-SLAPP statute] is 'so intertwined with a state right or remedy that it functions to define the scope of the state-created right,' it cannot be displaced by Rule 12(b)(6) or Rule 56." *Id.* at 89 (quoting *Shady Grove*, 130 S. Ct. at 1452 (Stevens, J., concurring)).

Two recent decisions by this Court have also followed the reasoning of the First Circuit in *Godin* as well as the other Circuits that have considered the applicability of state Anti-SLAPP legislation in federal courts.   *See Boley v. Atlantic Monthly Group*, No. 13-89, 2013 U.S. Dist. LEXIS 88494 (June 25, 2013); *Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29 (D.D.C. 2012); *see also Sherrod v. Breitbart*, 843 F. Supp. 2d 83, 85 (D.D.C. 2012) (noting that the District's Anti-SLAPP statute "is substantive – or at the very least, has substantive consequences" that would make it applicable in federal court); *but see 3M Co. v. Boulter*, 842 F. Supp. 2d. 85 (D.D.C. 2012) (finding that the D.C. Anti-SLAPP Act cannot apply in federal court because it is procedural, and therefore, conflicts with

14

Federal Rules of Civil Procedure 12 and 56).  And, the D.C.
Circuit recently upheld a district court decision denying a
special motion to dismiss pursuant to the District's Anti-SLAPP
Act because the motion was not filed within the 45-day limit
proscribed by the Act.  *Sherrod v. Breitbart*, No. 11-7088, 2013
U.S. App. LEXIS 12959 (June 25, 2013).  Though the Circuit did
not address the applicability of the District statute to a
federal court sitting in diversity, implicit in its holding that
defendant had failed to file its motion within the statutory
time frame is the conclusion that the statute applies in federal
court.  *Id.* at *12-13.  This Court is persuaded by those
Circuits that have held that similar statutes do apply in
federal court.

>        **C.    Merits of Defendants' Motion**
>
>            1.    <u>Prima Facie Showing of Protected Activity</u>

In order to prevail on their Anti-SLAPP Act motion,
defendants must make a "prima facie showing that the claim at
issue arises from an act in furtherance of the right of advocacy
on issues of public interest."  D.C. Code § 16-5502(b).  The
Court finds that defendants have made that showing here.

Defendants have shown that the Commentary and Mr.
Schanzer's statements are protected under several provisions of
the Anti-SLAPP Act.  As an initial matter, the Commentary
qualifies as a written statement made "[i]n a place open to the

public or a public forum in connection with an issue of public interest." *Id.* § 16-5501(1)(A)(ii).  FP's website is a "place open to the public," because anyone with a working internet connection or access to one can view it.  *See Boley*, 2013 U.S. Dist. LEXIS 88494, at *10 (finding that the website of The Atlantic was a "place open to the public"); *Farah*, 863 F. Supp. 2d at 38 (holding that statements in an internet blog posting were "made in a 'place open to the public or a public forum'") (quoting § 16-5501(1)(A)).

Mr. Schanzer's statements regarding Mr. Abbas concerned an issue of public interest because, contrary to Plaintiff's assertions, he is a "public figure."  *See* § 16-5501(3).  Although the Anti-SLAPP Act does not define the term "public figure," it is a term of art in the context of Plaintiff's defamation action.  There are two types of public figures: "general purpose and limited purpose public figures." *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987) (en banc).  "A person becomes a general purpose public figure only if he or she is a well-known celebrity, his name a household word." *Id.* (internal quotation marks omitted).  However, "[f]ew people attain the general notoriety that would make them public figures for all purposes." *Waldbaum v. Fairchild Publn's, Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980).  Instead, "public figures for the more limited purpose of certain issues or situations"

16

are much more common.  *Tavoulareas*, 817 F.2d at 772.  If "an
individual voluntarily injects himself or is drawn into a
particular public controversy[, he] thereby becomes a public
figure for a limited range of issues."  *Gertz v. Robert Welch,
Inc.*, 418 U.S. 323, 351 (1974).

Though Mr. Abbas has not achieved the kind of ubiquity or
notoriety to be considered a general purpose public figure, he
is a limited purpose public figure.  The Court is not persuaded
by Mr. Abbas's argument that he cannot be considered a limited
purpose public figure "by virtue of defending himself from the
slanderous claims by the controversy maker."  Opp'n to MTD at
13.  As defendants explain, Mr. Abbas has "voluntarily thrust
himself into a role of prominence in both Palestinian politics
and the controversy surrounding his wealth."  Defs.' MTD at 24.
He explains in his Complaint that he accompanies his father on
official trips, and that he travels as a special envoy "for the
benefit of the Palestinians and the Palestinian cause."  Compl.
¶ 40.  In the Complaint, Mr. Abbas also describes his role in
the repatriation of the Palestinian National Fund, in "ensuring
the resumption of US and Canadian aid to the UN Relief and Works
Agency for Palestinian Refugees," and in providing financial
assistance to Palestinian students and those Palestinians freed
from Israeli jails.  *Id.* ¶ 43.  In the past, Mr. Abbas has
openly discussed his wealth; indeed, he has claimed that 25

17

percent of his income went to the PA budget.   Defs.' MTD, Ex. I
at 2.   He has also claimed that the PA owes him a great deal of
money, but that he could not use his influence and status to
collect the debt in order to avoid being accused of exploiting
his father's position.   *Id.*   Under these circumstances, Mr.
Abbas cannot reasonably claim that he has no role in the
controversy apart from "simply defending himself against the
slander."   Opp'n to MTD at 13.   *See Waldbaum*, 627 F.2d at 1298
("Those who attempt to affect the result of a particular
controversy have assumed the risk that the press, in covering
the controversy, will examine the major participants with a
critical eye.").

Further, the question of U.S. aid to the Palestinian
Authority, and the level of corruption in the PA under both
Yasir Arafat and Mahmoud Abbas, is fundamentally a matter of the
public, not private, interest.[5]   *See* Anti-SLAPP Mot. at 5-6.   The

---

[5] Mr. Abbas has acknowledged as much in the past.   During an
interview in 2008, Mr. Abbas discussed corruption in the context
of the effect of the global financial crisis on the Palestinian
economy:

> We don't accept any kind of corruption claims to us these
> days, because the whole economy of the globe, the global
> economy, has been knocked down by corruption, either in the
> U.S., or in the Gulf, or in Europe, or in maybe Canada, or
> just name it . . . .   [T]his is the only country that's
> going up, everybody is going down – simply because we have
> a limited kind of corruption.   We don't have it anymore.
> It's been limited.   Everything is mainly under control.   I
> cannot say we have 100 percent control on corruption that

relationship between the United States and the Palestinian
Authority, and the way that U.S.-appropriated funds are used by
the Palestinian Authority has been debated at length for years.
The question of whether the sons of the President of the
Palestinian Authority are enriching themselves by virtue of
their political ties, and whether some of their wealth can be
traced to U.S. tax dollars is part of that issue.  As defendants
point out, numerous publications in the United States and
throughout the world have written extensively about corruption
in the Palestinian Authority generally, and the Abbas family's
wealth specifically.  *See* Defs.' MTD at 23-24.  Indeed, Mr.
Abbas does not dispute that "there is a public controversy
concerning allegations of corruption within the Palestinian
Authority."  Opp'n to MTD at 13.

Finally, even setting aside whether Mr. Abbas is a "public
figure" or whether the corruption in the Palestinian Authority
is a "public issue," Mr. Schanzer's statements while testifying

we had before – no – but I can claim it's in the 90's, it's
in the high 90's, because it's not easy for anyone to go
and really start, you know, having any sort of corruption
in any project that comes up.  It's not that easy, it's not
that easy anymore.  Everybody knows that the President is
holding the stick on everybody's head, ok?  And he always
threatens with that stick, so they know.  It's not a joke.
As a result, we don't accept the corruption slogan anymore.
After the past three months, I can't accept it.  I
personally will attack anyone who talks about the
Palestinian corruption[.]

Anti-SLAPP Mot., Jones Decl., Exhibit 6, at Part 3.

before Congress and in the Commentary are "written or oral
statement[s]" made "[i]n connection with an issue under
consideration or review by a legislative, executive, or judicial
body, or any other official proceeding authorized by law."  D.C.
Code § 16-5501(1)(A)(i).  Plaintiff concedes that the Commentary
at issue was written after Mr. Schanzer testified before
Congress regarding "the topic of U.S. Aid to Palestinians"
during which he purportedly suggested that it would be a
"worthwhile inquiry [to] explore the way in which Abbas' sons,
Yasser and Tarek, have accumulated wealth since their father
took office in 2005."  Compl. ¶¶ 57-61.

        2.   <u>Likelihood of Success on the Merits</u>

Because defendants have made a prima facie showing that Mr.
Abbas's defamation claim "arises from an act in furtherance of
the right of advocacy on issues of the public interest," Mr.
Abbas must now show that he is likely to succeed on the merits
of his defamation claim in order to survive defendants' Anti-
SLAPP motion.  D.C. Code § 16-5502(b).  The Act does not define
what it means to succeed on the merits, so the Court looks to
relevant case law from California as instructive.  There, in
order to show a "probability of prevailing on a claim" in
opposition to an Anti-SLAPP motion to dismiss, a plaintiff "must
satisfy a standard comparable to that used on a motion for
judgment as a matter of law."  *Price v. Stossel*, 620 F.3d 992,

1000 (9th Cir. 2010); *see also Arenas v. Shed Media US Inc.*, 881
F. Supp. 2d 1181, 1188 (C.D. Ca. 2011).  Thus, a plaintiff "must
demonstrate that the complaint is legally sufficient and
supported by a prima facie showing of facts to sustain a
favorable judgment if the evidence submitted by the plaintiff is
credited." *Price*, 620 F.3d at 1000 (quoting *Metabolife Int'l,
Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001)).  If a
"plaintiff fails to present a sufficient legal basis for the
claims or if the evidence offered is insufficiently substantial
to support a judgment in favor of the plaintiff, then the
defendant's anti-SLAPP motion should be granted." *Arenas*, 881
F. Supp. 2d at 1188 (citing *Price*, 620 F.3d at 1000).

     To prevail on his defamation claim under District of
Columbia law, Mr. Abbas must show:

> (1) that the defendant made a false and defamatory
> statement concerning the plaintiff; (2) that the defendant
> published the statement without privilege to a third party;
> (3) that the defendant's fault in publishing the statement
> amounted to at least negligence; and (4) either that the
> statement was actionable as a matter of law irrespective of
> special harm or that its publication caused the plaintiff
> special harm.

*Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005) (internal
quotation marks omitted)).  "Falsity and defamatory meaning 'are
distinct elements of . . . defamation and are considered
separately.'" *Carpenter v. King*, 792 F. Supp. 2d 29, 34 (D.D.C.
2011) (quoting *White v. Fraternal Order of Police*, 909 F.2d 512,

520 (D.C. Cir. 1990).  If the plaintiff is a public figure, he faces a higher burden, and must show, by clear and convincing evidence, that a defendant published the allegedly defamatory statements with "'actual malice'—that is, without knowledge that it was false or with reckless disregard of whether it was false of not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964); *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991).

To show falsity, a plaintiff "must demonstrate either that the statement is factual and untrue, or an opinion based implicitly on facts that are untrue." *Carpenter*, 792 F. Supp. 2d at 34 (quoting *Lane v. Random House*, 985 F. Supp. 141, 150 (D.D.C. 1995)).  A statement is defamatory "if it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1293-94 (D.C. Cir. 1998) (quoting *Howard Univ. v. Best*, 484 A.2d 958, 988 (D.C. 1984)).  The statement "must be more than unpleasant or offensive; the language must make the plaintiff appear 'odious, infamous, or ridiculous.'" *Best*, 484 A.2d at 989 (quoting *Johnson v. Johnson Publ'g Co.*, 271 A.2d 696, 697 (D.C. 1970). "The plaintiff has the burden of proving the defamatory nature of [the challenged] publication, . . . and the publication must be considered as a whole, in the sense in which it would be

22

understood by the readers to whom it was addressed." *Id.* Words should be given their plain and natural meaning, and "the statements at issue should not be interpreted by extremes, but should be construed as the average or common mind would naturally understand them." *Klayman v. Segal*, 783 A.2d 607, 616 (D.C. 2001). Whether an allegedly defamatory statement is capable of defamatory meaning is a question of law. *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001).

As noted in footnote 3 *supra*, Mr. Abbas has considerably narrowed his defamation claim in his Opposition to Defendants' Motion to Dismiss. He now contends that he does not contest portions of the Commentary that relate to his business interests. Mr. Abbas explains that

> the principal allegations supporting [his] libel claim are
> the paragraphs concerning the article's [] libelous
> questions, the allegations that the article purports to
> provide 'new details' regarding those libelous questions,
> and the allegations concerning the information provided by
> Mr. Schanzer's unidentified sources, which are the only
> 'new details' used by Mr. Schanzer to support the libelous
> implication of his libelous questions—namely, that [he] has
> wrongfully enriched himself at the expense of regular
> Palestinians and even U.S. taxpayers.

Opp'n to MTD at 12.

Defendants argue that these challenged portions of the Commentary are not actionable because: (1) the purportedly "libelous questions" are unanswered questions, not statements of fact, and to the extent that the questions imply anything, they

23

imply a non-actionable opinion; and (2) the purported "new details" that Plaintiff objects to are not capable of defamatory meaning because they are not of and concerning him.  Defs.' Reply to MTD at 3.  In response, Mr. Abbas argues that the Commentary is a "reporting piece, not a *mere* opinion piece." Plaintiff's Opp'n to MTD at 9 (emphasis in original).

> ### a.   "Libelous Questions"
>
> > #### i.   The Two Questions are Rhetorical, and Are Not Assertions of Fact

Mr. Abbas contends that the Commentary poses two "libelous questions:" (1) "Are the sons of the Palestinian president growing rich off their father's system?; and (2) "Have they enriched themselves at the expense of regular Palestinians—and even U.S. taxpayers?"  Plaintiff's Opp'n to MTD at 6; Compl. ¶¶ 10, 13; Defs.' MTD, Ex. A, at 3.  Mr. Abbas alleges that these questions "may be read as assertions of false fact that [he] is wrongfully and possibly criminally getting rich off his 'father's system.'"  Plaintiff's Opp'n at 6-7.  Purportedly, these questions ask "those he works with and all the world to wonder if plaintiff has 'enriched' himself 'at the expense of regular Palestinians – and even U.S. taxpayers.'"  Compl. ¶ 49. Defendants argue that "the Commentary merely posed questions, without stating or implying as factual matter that Plaintiff was guilty of criminal or corrupt conduct, and Plaintiff has wholly

mischaracterized the Commentary in an effort to suggest otherwise." Defs.' Reply to MTD at 1.

A statement challenged as defamatory, regardless of whether it is posed as a question, cannot be libelous unless it can reasonably be read as a false assertion of fact. *See Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993). "[I]nquiry itself, however embarrassing or unpleasant to the subject, is not accusation." *Id.* In *Chapin*, the court considered an article published in the *Philadelphia Inquirer* that questioned the finances of a charity program run by plaintiff through which people could send gift packages to soldiers stationed in Saudi Arabia. *Id.* at 1091. In one purportedly defamatory section of the article, the author posed a question regarding plaintiff's involvement in the charity: "Who will benefit more from the project – GIs or veteran charity entrepreneur Roger Chapin of San Diego and Falls Church, Va., the organizer of the campaign?" Id. at 1093-94. While acknowledging that the question was "pointed, and could certainly arouse a reader's suspicion," the court ruled that it could not "reasonably be read to imply the assertion of the false and defamatory fact – pocket-lining – of which plaintiffs complain." *Id.* at 1094. Instead, the court held that the "question simply provokes public scrutiny of the plaintiffs' activities." *Id.* Plaintiff also challenged another portion of

the article in which the author wrote, "it is not clear where
the rest of the money goes." *Id.* at 1095.  The court held that
the author was not making a false assertion, but rather was
"invit[ing] the public to ask." *Id.* at 1096.  That one of the
possible answers to that question was that "Chapin is a
dishonest man who pockets the difference" did not make the
statement defamatory, and according to the court, was "precisely
why we need and must permit a free press to ask the question."
*Id.*

Other courts that have considered whether a question can
support a defamation claim have reached a similar conclusion.
In *Partington v. Bugliosi*, the court considered whether a
rhetorical question regarding an attorney's trial strategy was
capable of defamatory meaning.  56 F.3d 1147, 1155 (9th Cir.
1995).  In the passage at issue, the author, an attorney for a
co-defendant in the same trial, asked:  "Had Walker's lawyer not
*read* the theft-trial transcripts?  Our copy had ended up in a
warehouse; perhaps theirs had too." *Id.* (emphasis in original).
The court held that the statement did not imply that plaintiff
had not read the transcripts and therefore did not adequately
represent his client.  *Id.* at 1156.  In rejecting plaintiff's
assertion that the statement was defamatory, the court explained
that "the rhetorical device used by [the defendant] negates the
impression that his statement implied a false assertion of

26

fact." *Id.* at 1157.   Instead, the author's use of a question
made clear his lack of definitive knowledge and invited the
reader to consider various possibilities.   *Id.   See also Phantom
Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 730 (1st Cir.
1992) (holding that statements in a series of articles published
in the *Boston Globe*, including a rhetorical question regarding
whether plaintiff was "trying to score off the success of Andrew
Lloyd Webber's 'Phantom,'" were not defamatory because they
"reasonably could be understood only as [the author's] personal
conclusion about the information presented, not as a statement
of fact")[6].

     Similarly, the two questions posed in the Commentary cannot
reasonably be read to imply the meaning that Mr. Abbas alleges –
that he "is wrongfully and possibly criminally getting rich off
of his 'father's system'" or that he is enriching himself "at
the expense of regular Palestinians and even U.S. taxpayers" –
nor can they be read to imply the assertion of objective facts.
Opp'n to MTD at 6-7, 12.   Though the conclusions Mr. Abbas draws

---

[6] The Court is not persuaded by Mr. Abbas' attempts to
distinguish *Phantom Touring* on the ground that the entirety of
the Commentary "conveys the impression that the author is
reporting a fact-based news item."   Opp'n to MTD at 7-8.   The
*Phantom* court concluded that the challenged statements,
including that the production was "fake" and "phony," were not
defamatory because "[t]he sum effect of the format, tone and
entire content of the articles is to make it unmistakably clear
that [the author] was expressing a point of view only."   953
F.2d at 729.   For the reasons explained in Section II.C.2.b
*infra*, the same is true here.

are possible answers to the questions posed by Mr. Schanzer, the
questions invite the reader to form her own judgments regarding
the relationship between Mr. Abbas's family ties and his
admittedly great wealth.  The reader could arrive at a number of
different conclusions, a fact that Mr. Abbas acknowledges in his
own complaint.  *See* Compl. ¶ 49 (alleging that the Commentary
asks "those he works with and all the world to wonder if
plaintiff has 'enriched' himself at the expense of 'regular
Palestinians – and even U.S. taxpayers'").  That Mr. Abbas would
prefer that readers do not answer the questions in the
affirmative is not sufficient to support his defamation claim.
Indeed, the invitation in the Commentary for the reader to form
her own opinion is not libel, rather it "is the paradigm of a
properly functioning press." *Chapin*, 993 F.2d at 1096.

> ii.   The Questions Imply an Opinion, Not a
>       Fact

Even if the two questions posed by Mr. Schanzer were
capable of defamatory meaning, they are statements of opinion
protected by the First Amendment because they do not contain a
provably false connotation.  *See Milkovich v. Lorain Journal
Co.*, 497 U.S. 1, 21 (1990).   Where the factual basis for a
conclusion is outlined in the article, or, as is the case here,
for the questions, those statements are protected by the First
Amendment.  *See Moldea v. New York Times Co.*, 22 F.3d 310, 318

(D.C. Cir. 1994) (holding that where "the readers understand that [] supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon the facts, this type of statement is not actionable in defamation").  In distinguishing opinions from assertions of fact, the court can consider the language used, the context of the language, and the extent to which the language can be verified.  *Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984) (en banc).

First, the rhetorical questions in the Commentary are supported by facts provided in article as well as hyperlinked source material in the form of articles in other publications, company websites, and interviews given by the plaintiff.  All of this serves to put the reader on notice that the piece is one of opinion.  *Ollman*, 750 F.2d at 987-88.  Second, like the op-ed piece at issue in *Ollman*, the Commentary appeared in the "Arguments" section of the FP website.  That page is described as "[p]olemical, controversial, and powerful," and aims to provide "timely insight on stories making headlines around the world."  MTD at 10.  It is reasonable to assume that the "Arguments" section of FP is one in which readers expect to find analytical and opinionated pieces that reflect a particular viewpoint.  *See, e.g. Moldea*, 22 F.3d at 313 (noting that a book review is a "forum in which readers expect to find such

evaluations" of a literary work).   Moreover, writing like that

in the Commentary is "[a]t the heart of the First Amendment,"

which recognizes the "fundamental importance of the free flow of

ideas and opinions on matters of public interest and concern."

*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988).   This

recognition has been vigorously upheld in the District of

Columbia:

> If the First Amendment's guarantees of freedom of speech
> and of the press are to ensure that these rights are
> meaningful not simply on paper, but also in the practical
> context of their exercise, then a[n] Op-Ed column
> discussing a subject of public interest must surely be
> accorded a high level of protection, lest the expression of
> critical opinions be chilled.   This is so because "[t]he
> reasonable reader who peruses [a] column on the editorial
> or Op-Ed page is fully aware that the statements found
> there are not 'hard' news like those printed on the front
> page or elsewhere [in the magazine].   Readers expect that
> columnists will make strong statements, sometimes phrased
> in a polemical manner that would hardly be considered
> balanced or fair elsewhere in the [magazine]."

*Guilford Transp. Industries, Inc. v. Wilner*, 760 A.2d 580, 582-

83 (D.C. 2000) (quoting *Ollman*, 750 F.2d at 986).

In in an attempt to demonstrate that the two questions

posed by Mr. Schanzer are defamatory and not merely statements

of opinion, Mr. Abbas argues that "[t]hey do, in fact, contain

provably false factual connotations" because "whether he is

growing rich from alleged corruption in the Palestinian

Authority is certainly a provable fact by investigating

Plaintiff's relevant financial records."   Opp'n to MTD at 9.

However, Mr. Abbas seeks to reframe his defamation claim, and indeed the subject matter of the article, in trying to defend his point.  The questions the Commentary purportedly answers is whether Mr. Abbas and his brother are growing rich off their father's political power and connections, not whether they are growing rich as a result of generalized corruption in the Palestinian Authority.  *See generally*, Defs.' MTD, Ex. A; *see also* Opp'n to MTD at 10.  Nevertheless, even the relationship between Mr. Abbas's business success and corruption in the PA were at issue in the Commentary, as defendants argue, "[g]iven the myriad of factors that may have contributed to Plaintiff's wealth—his education, his experience, his skill, and indeed, his connections and opportunities—it would be impossible to prove that Plaintiff grew wealthy solely because of his father" or solely by virtue of corruption in the Palestinian Authority. Defs.' MTD at 10; *see also Volm v. Legacy Health Sys., Inc.*, 237 F. Supp. 2d 1166, 1178 (D. Or. 2002) (finding that the question "[w]ould you want to go to a hospital where they did not thoroughly check out the people who would be administering medical care to you?," which was posed to a patient of the practice, was not an assertion of objective fact because it was a rhetorical question not "capable of being proven true or false").

While there is no "wholesale exemption from liability in defamation for statements of 'opinion,'" the purportedly libelous questions at issue do not "imply a provably false fact, or rely upon stated facts that are provably false."  Therefore, for this additional reason, Mr. Abbas's defamation claim based on these questions in the Commentary must fail.[7]  *Moldea*, 22 F.3d at 313.

---

[7] As Defendants briefly discuss in their motion to dismiss, Mr. Abbas' libel claim arising from the rhetorical questions posed in the Commentary also fails on the basis of the District's Fair Comment Privilege.  *See* Defs.' MTD at 11. "The District of Columbia has long recognized and accorded the media the privilege of fair comment on matters of public interest" as long as the opinions are based on true facts.  *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 88 (D.C. 1980); *see Jankovic v. Int'l Crisis Group*, 593 F.3d 22, 29 (D.C. Cir. 2010).  The privilege affords "legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact."  *Milkovich*, 497 U.S. at 13 (internal citations omitted).  In the District of Columbia, the fair comment privilege is applicable "even if the facts upon which [the opinion] is based are not included along with the opinion."  *Fisher v. Washington Post Co.*, 212 A.2d 335, 338 (D.C. 1965) (internal citations omitted).

Here, it is undisputed that the issue of corruption in the Palestinian Authority is one of public interest.  *See* Opp'n to MTD at 13 ("Plaintiff acknowledges that there is a public controversy concerning allegations of corruption within the Palestinian Authority.").  The allegedly "libelous questions" are posed by Mr. Schanzer in the context of an article that generally discusses that issue in the context of an article about whether the sons of President Abbas are benefiting from their family connections.  Hyperlinks to the underlying information upon which Mr. Schanzer is reporting are provided in the online version of the article.  Mr. Schanzer's questions, which he does not conclusively answer, are his interpretation of those underlying facts, an action which is protected by the Fair Comment Privilege.

b.   "New Details"

In the Commentary, Mr. Schanzer writes that "new details are emerging of how close family members of Palestinian leader Mahmoud Abbas, a major U.S. partner in the Middle East, have grown wealthy."  Compl. ¶ 13; Defs.' MTD, Ex. A, at 2.  Mr. Abbas alleges that these "new details" support the conclusion that he is "enriching himself at the expense of regular Palestinians—and even U.S. taxpayers."  Opp'n to MTD at 10-11. He asserts that these new details consist of two things:  (1) allegations by Mohammad Rachid that Mahmoud Abbas has "socked away $100 million in ill-gotten gains; and (2) a statement that during a research trip to Ramallah in 2011 "several Palestinians" told the author that the issue of the Abbas family dynasty was common knowledge in the PA, but that it was rarely discussed because of a "growing fear of retribution by PA security officers, who have apprehended **journalists and citizens** for openly challenging President Abbas's authority."[8]  Opp'n to MTD at 6.  The Court addresses these in turn.

---

[8] It is not clear to the Court that these two things are the "new details" Mr. Schanzer is referencing in the Commentary, which relate to "how close family members of Palestinian leader Mahmoud Abbas . . . have grown wealthy."  Defs.' MTD, Ex. A at 2.  This sentence is followed by a lengthy discussion of Mr. Abbas's business interests in the Middle East.  *Id*. at 2-3.  For the reasons set forth in footnote 3 *supra*, Mr. Abbas has conceded that the portions of the Commentary detailing his business interests are not defamatory.  Accordingly, the Court

Regarding Mohammad Rachid, Mr. Schanzer writes:

[President] Abbas's wealth recently became a source of controversy during the investigation of Mohammad Rachid, an economic advisor to the late Palestinian leader Yasir Arafat, in a high-profile corruption probe.  Last month, Palestinian officials charged Rachid with siphoning off millions of dollars in public funds . . . .

According to a former Palestinian advisor, [President] Abbas holds a grudge against Rachid dating back to the peace talks during the waning days of the Clinton era. . . .  "There was a huge amount of jealousy," the former advisor said.

With his back up against a wall, Rachid has now fired back at the Palestinian president with claims that Abbas himself has socked away $100 million in ill-gotten gains.

Defs.' MTD, Ex. A at 1.  Mr. Abbas alleges that Mr. Rachid's allegations are untrue, and that Mr. Schanzer uses the allegations to "link Plaintiff to this lie by his implication that: 'The conspicuous wealth of Abbas's own sons, Yasser and Tarek, has become a source of quiet controversy in Palestinian society since at least 2009.'"  Compl. ¶ 15.

Plaintiff's argument fails.  As the context of the statement makes clear, the discussion of Mr. Rachid in the Commentary, and his allegations of "ill-gotten gains," relate to President Mahmoud Abbas, not Plaintiff.  As such, these statements cannot be the basis of any libel claim brought by Mr. Abbas, because they are not of and concerning him.  *See N.Y.*

---

does not address them here and for the purposes of resolving the pending motions, the Court accepts Plaintiff's characterization of the "new details" in the Commentary.

*Times Co.*, 376 U.S. at 288); *Croixland Props. Ltd. P'ship v. Corcoran*, 174 F.3d 213, 216 (D.C. Cir. 1999) ("To satisfy the 'of and concerning' element, it suffices that the statements at issue lead the listener to conclude that the speaker is referring to plaintiff by description, even if the plaintiff is never named or misnamed."). Even if the statement was about Plaintiff, or if his father brought a libel claim, the statement is not defamatory because Mr. Rachid's allegation is not reported as fact, and is instead put in context, "making it clear to the reader that Rachid's statement is merely the latest in an ongoing exchange of charge and countercharge." Defs.' MTD at 14 n. 7.

Similarly, the second alleged "new detail" is not defamatory. Mr. Schanzer writes:

> On a research trip to Ramallah last year, several Palestinians told me that the Abbas family dynasty is common knowledge. However, discussion of the issue rarely rises above a whisper – thanks to fear of retribution by PA security officers, who have apprehended **journalists and citizens** for openly challenging President Abbas's authority.

Defs.' MTD, Ex. A at 3. Mr. Abbas alleges that "[r]eferences to what 'several Palestinians told me' by defendant Schanzer in the FP article is no evidence to support the allegation that Palestinian Authority security officers are being used to protect plaintiff's reputation." Compl. ¶ 38.

First, the account of what "several Palestinians" told the author is support for the statement the Abbas family dynasty is common knowledge in the PA.  It is not defamatory because it is not an assertion of false fact, or indeed, of *any* fact.  Mr. Schanzer is reporting on what people in the region have said to him, and does not otherwise take any position on what he has heard.

Second, the Commentary does not state, nor does it imply, that PA security officers are protecting Plaintiff's reputation; rather, it suggests that PA security officers are protecting *his father's* authority.  There is nothing in the Commentary to suggest that Plaintiff has any involvement with PA security officers, or that PA security officers are acting at his direction.  Therefore, the statement is not defamatory because it is not of and concerning Plaintiff.

III. Conclusion

For the foregoing reasons, the Court concludes that the defendants have made a prima facie showing that Mr. Abbas's defamation claim arises from an act in furtherance of the right of advocacy on issues of the public interest, and that Mr. Abbas has failed to demonstrate a likelihood of success on the merits of his defamation claim because the contested statements are either not capable of defamatory meaning or are protected statements of opinion.  Accordingly, the Defendants' special

motion to dismiss pursuant to the District's Anti-SLAPP Act is

**GRANTED**, Defendants' motion to dismiss pursuant to rule 12(b)(6)

is **DENIED** as moot, and Plaintiff's complaint is **DISMISSED WITH**

**PREJUDICE** pursuant to the Anti-SLAPP Act.  An appropriate Order

accompanies this Memorandum Opinion.

**SIGNED:**    **Emmet G. Sullivan**
                **United States District Judge**
                **September 27, 2013**