IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| YASSER ABBAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-cv-01565 |
| | ) | |
| FOREIGN POLICY GROUP, LLC, | ) | |
| A DIVISION OF THE WASHINGTON | ) | |
| POST COMPANY, AND | ) | |
| JONATHAN SCHANZER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR
FEES AND COSTS UNDER THE D.C. ANTI-SLAPP ACT**

Having prevailed on their special motion to dismiss Plaintiff Yasser Abbas's defamation complaint under the District of Columbia Anti-SLAPP Act, D.C. Code § 16-5502, Defendants Foreign Policy Group, LLC and Jonathan Schanzer move for their "costs of litigation, including reasonable attorney fees." D.C. Code § 16-5504(a). In support of their motion, Defendants submit this memorandum of law and accompanying affidavits from counsel for Foreign Policy and Dr. Schanzer, providing an explanation for the fees and expenses that were incurred.

**BACKGROUND**

As the Court is aware, on June 5, 2012, Foreign Policy published a commentary on the "Arguments" section of its website written by Dr. Schanzer and headlined "The Brothers Abbas" (the "Commentary"). Less than a week later, Plaintiff publicly threatened to sue Foreign Policy, *see* Dkt. No. 17 (Jones Decl., Ex. 33), and less than a month later, Plaintiff's London-based counsel sent a demand letter to Foreign Policy and Dr. Schanzer, calling the Commentary

"highly defamatory," chronicling what Plaintiff's counsel characterized as "numerous untruths," and threatening litigation. *See id*. (Jones Decl., Ex. 34). Counsel for Foreign Policy promptly responded to Plaintiff's letter,[1] addressing each of the 13 passages about which Plaintiff's counsel complained, and explaining that Foreign Policy and Dr. Schanzer are entitled to raise questions and "express opinions based on accurately disclosed facts about a matter of public importance." *See id*. (Jones Decl., Ex. 35). Undeterred, Plaintiff sued Foreign Policy and Dr. Schanzer on September 20, 2012, seeking compensatory and punitive damages of $20 million. Dkt. No. 1 (Complaint ¶ 95).

Plaintiff's complaint tracked his demand letter, alleging that at least a dozen separate portions of the Commentary are false and defamatory. In response to Defendants' motions to dismiss under the Anti-SLAPP Act and Rule 12(b)(6), however, Plaintiff did not try to defend most of what he had alleged was false and defamatory. Instead, he significantly narrowed his defamation claim, as the Court noted in its Memorandum Opinion of September 27, 2013. Dkt. No. 28 (Memorandum Opinion, at 6 n.6) ("Op."). The Court dismissed Plaintiff's complaint "with prejudice" under the Anti-SLAPP Act, finding that Plaintiff's claim arose from an act in furtherance of the right of advocacy on issues of public interest, and that Plaintiff was unlikely to succeed on the merits of his defamation claim "because the contested statements are either not capable of defamatory meaning or are protected statements of opinion." Op. at 36–37. On September 30, 2013, the Court invited Defendants to submit their motion for fees and costs by October 16. Upon agreement of the parties, the Court extended that deadline to October 25.

---

[1] The response was from James McLaughlin, Associate Counsel of The Washington Post, which was then under the common ownership of The Washington Post Company. The Washington Post newspaper, but not Foreign Policy, has since been sold to a new owner.

## ARGUMENT

The Anti-SLAPP Act provides "substantive rights with regard to a defendant's ability to fend off lawsuits filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view." Rep. of the D.C. Comm. on Public Safety and the Judiciary on Bill 18-893, at 1 (Nov. 19, 2010) ("Comm. Report"). One of those rights is the prevailing party's ability to recover its fees and costs, *see Sherrod v. Breitbart*, 843 F. Supp. 2d 83, 85 n.4 (D.D.C. 2012), *aff'd*, 720 F.3d 932 (D.C. Cir. 2012), a recognition of the reality that "defendants of a SLAPP" are forced to expend "a substantial amount of money, time and legal resources." Comm. Report at 1; *cf. Containment Tech. Group, Inc. v. Am. Soc'y of Health Sys. Pharmacists*, 2009 WL 2750093, at *2 (S.D. Ind. Aug. 26, 2009) (noting that the fee-shifting provision of Indiana's anti-SLAPP law "is designed 'to place the financial burden of defending against so-called SLAPP actions on the party abusing the judicial system by bringing a SLAPP lawsuit'") (citation omitted).

The Act thus provides:

> The court may award a moving party who prevails, in whole or in part, on a motion brought under § 16-5502 or § 16-5503 the costs of litigation, including reasonable attorney fees.

D.C. Code § 16-5504(a). As explained below, this case involves circumstances that make the award of the reasonable fees and expenses that Defendants seek especially appropriate.

### I. The Court Should Exercise Its Discretion and Award Fees and Costs.

The plain language of the Anti-SLAPP Act suggests that the award of litigation fees and costs is discretionary. *See id*. In providing that the Court "may" award fees, the Act is analogous to numerous fee shifting statutes, most notably including federal civil rights statutes. *See, e.g.*, 42 U.S.C. § 1988(b) ("the court, in its discretion, may allow the prevailing party . . . a

reasonable attorney's fee"); 42 U.S.C. 2000e-5(k) (same).  Despite the permissive language in those statutes, courts have recognized "'a presumption that successful civil rights litigants should ordinarily recover attorneys' fees unless special circumstances would render an award unjust.'" *David v. District of Columbia*, 489 F. Supp. 2d 45, 51 n.11 (2007) (quoting *Raishevich v. Foster*, 247 F.3d 337, 344 (2d Cir. 2001)).  A similar standard is warranted in the SLAPP context, where the claim is "often without merit," and the goal is "not to win the lawsuit . . . but [to] punish . . . and intimidate" the exercise of a civil right.  Comm. Report at 1, 4.

Fees are especially appropriate in this case because Plaintiff was placed on notice that his claim lacked merit before he filed his complaint, and he has a history of using lawsuits to retaliate against the press.  On August 6, 2012, counsel for Foreign Policy provided a detailed response to Plaintiff's demand letter, addressing each of Plaintiff's complaints about the Commentary.[2]  Dkt. No. 17 (Jones Decl., Ex. 35).  Forecasting the Court's opinion dismissing Plaintiff's complaint, the letter concluded:

> **[W]e must emphasize that Foreign Policy and Dr. Schanzer are entitled to express opinions based on accurately disclosed facts about a matter of public importance**—especially one of such newsworthiness for an American audience as the expenditure of U.S. government funds and the conduct of U.S. foreign policy relating to the Palestinian territories . . . . Foreign Policy is a U.S. publication whose **reporting about a public figure like Mr. Abbas is squarely protected by the First Amendment to the U.S. constitution** . . . . [W]e believe that your client's objections, in substance, amount to a **disagreement with the questions posed by Dr. Schanzer from a responsible marshalling of the publicly available evidence**.

---

[2]  In Plaintiff's demand letter, as in his complaint, he asserted that over a dozen individual passages in the Commentary were defamatory.  Confronted with Defendants' motions to dismiss, which explained, again, why those assertions lacked merit, Plaintiff back-pedaled—conceding that the Commentary's references to his businesses were "not the basis for [his] libel claim."  Op. at 6 n.6 (quoting Plaintiff's Opposition to Motion to Dismiss, at 10).

4

*Id*. at 7 (emphases added); *cf*. Op. at 28 ("Even if the two questions posed by Mr. Schanzer were capable of defamatory meaning, they are statements of opinion protected by the First Amendment because they do not contain a provably false connotation."); Op. at 36 (holding that Plaintiff's claim was unlikely to succeed on the merits "because the contested statements are either not capable of defamatory meaning or are protected statements of opinion").

The letter also invited Plaintiff to submit a letter to the editor or "other submission in which Mr. Abbas . . . would have the opportunity to respond to the piece as a whole." Dkt. No. 17 (Jones Decl., Ex. 35, at 1). Rather than take the opportunity to address the allegedly defamatory statements in the Commentary and provide his own answers to the questions it posed, Plaintiff proceeded to file this meritless lawsuit.

The commencement of this action was consistent with what this Court described as Plaintiff's history of using "the threat of defamation litigation to counter bad press." Op. at 3. Between 2008 and 2010, Plaintiff and his family have sued, or threatened to sue, at least three media organizations, including an Israeli television channel, Reuters, and Al-Jazeera. Op. at 3–4. These lawsuits, and related threats, reflect precisely the kind of attempt to silence one's critics that the Anti-SLAPP Act was intended to stop. *See* Comm. Report at 4 (noting that for SLAPP plaintiffs, "[l]itigation itself is the . . . weapon of choice" used to "intimidate [opponents] into silence") (alternation in original) (emphasis and internal quotation marks omitted). It is also noteworthy that Plaintiff's theories sought indirectly to attack Dr. Schanzer for testifying before Congressional committees, even though legislative testimony is absolutely privileged as a matter of law and is a core example of the exercise of the right to petition. Plaintiff's resort to litigation in this case, combined with his history of litigiousness in the face of criticism, fully support an award of fees and costs to Defendants.

## II. The Fees and Costs Defendants Seek are Reasonable.

Turning to the reasonableness of the specific amounts requested, the starting point for courts in this District for determining a reasonable award of attorneys' fees is the "lodestar method," which "'is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.'" *Heller v. District of Columbia*, 832 F. Supp. 2d 32, 37 (D.D.C. 2011) (Sullivan, J.) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)); *see also West v. Potter*, 717 F.3d 1030, 1034 (D.C. Cir. 2013); *Hubbard v. Donahoe*, 2013 WL 3943495, at *7 (D.D.C. July 31, 2013); *McKesson Corp. v. Islamic Rep. of Iran*, 2013 WL 1224808, at *3 (D.D.C. Mar. 27, 2013). A strong presumption exists that the "'lodestar figure'" represents a reasonable fee. *D.L. v. District of Columbia*, 256 F.R.D. 239, 242 (D.D.C. 2009) (quoting *Pa. v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986)). Courts in the District of Columbia likewise approve of the lodestar method. *Fed. Mktg. Co. v. Va. Impression Prods. Co.*, 823 A.2d 513, 530 (D.C. 2003). This Court has held that essentially two determinations are necessary under the lodestar method: "(1) what constitutes a 'reasonable hourly rate' for the services of [the party's] counsel; [and] (2) the number of hours that were reasonably expended on the litigation." *Heller*, 832 F. Supp. 2d at 38 (citation omitted).

### A. Defendants' Hourly Rates Are Reasonable.

The appropriate hourly rate at which Defendants' attorneys should be compensated incorporates three factors: "[1] the attorneys' billing practices; [2] the attorneys' skill, experience, and reputation; and [3] the prevailing market rates in the relevant community." *Id.* (internal quotation marks omitted). This Court has the discretion to adjust the requested hourly rate upward or downward "to arrive at a final fee award that reflects the characteristics of the

particular case (and counsel) for which the award is sought." *Id*. (internal quotation marks omitted).

First, with regard to Defendants' billing practices, "'**an attorney's usual billing rate is presumptively the reasonable rate, provided that th[e] rate is in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation**.'" *Id.* (emphasis added) (internal quotation marks omitted). The applicable standard rates to consider are those for 2013, to reflect the fact that any award of fees would provide compensation for fees paid a year or more ago. *See Copeland v. Marshall*, 641 F.2d 880, 893 n.23 (D.C. Cir. 1980); *McKesson*, 2013 WL 1224808, at *6. The rates charged by Defendants' attorneys and paralegals are presumptively reasonable because they actually reflect a substantial discount from their standard billing rates, as detailed in the Declarations of Nathan Siegel and Kevin Baine accompanying this Memorandum.

Levine Sullivan Koch & Schulz, LLP ("Levine Sullivan"), counsel for defendant Jonathan Schanzer, charged a blended hourly rate of $390 for all attorneys on the matter, and $195 for paralegals, as requested and negotiated by Dr. Schanzer's insurer. Both rates reflect more than a 20 percent discount from the firm's standard hourly rates. *See, e.g.*, *Mid-Continent Cas. Co. v. Chevron Pipe Line Co.*, 205 F.3d 222, 234 (5th Cir. 2000) (approving the use of blended rates). If the firm's standard billing rates were used, a comparable blended rate for the time actually worked would have been about $515 for the three attorneys (using 2013 rates) and $240 for paralegals. Siegel Decl. ¶¶ 13–17. Williams & Connolly, LLP ("W&C"), counsel for defendant Foreign Policy Magazine, nominally charged hourly rates of $765 for the lead partner on the case, $409.50 for a sixth-year associate, and $342 for a third-year associate. Baine Decl.

¶¶ 3–4, 8. These rates represented a 10 percent discount off of W&C's standard hourly rates. *Id.*
¶ 8. W&C then further discounted its fees by an average of 12 percent per month. *Id.* ¶ 9.

Second, "'prevailing parties must offer evidence to demonstrate their attorneys' experience, skill, reputation, and the complexity of the case they handled.'" *Heller*, 832 F. Supp. 2d at 39 (internal quotation marks omitted). Defendants have provided to the Court evidence from which to demonstrate counsel's experience, skill, and reputation, in the attached declarations. *See generally* Siegel Decl.; Baine Decl.

Finally, the court must consider whether the billing rates of Defendants' attorneys are in line with those prevailing in the D.C. legal community "for attorneys of reasonably comparable skill, experience, and reputation." *Covington v. District of Columbia*, 57 F.3d 1101, 1108 (D.C. Cir. 1995). The Circuit has advised that to demonstrate the prevailing market rate, a party may point to "their own survey of prevailing market rates in the community," *id.* at 1109, and in litigation like the present, between sophisticated private litigants, "'**the best measure of [the rates] the market will allow are the rates actually charged**.'" *McKesson*, 2013 WL 1224808, at *5 (quoting *Yazdani v. Access ATM*, 474 F. Supp. 2d 134, 138 (D.D.C. 2007)) (emphasis added). This Court has noted an additional nuance influencing the market rate determination—rates of large law firms, like W&C, are generally higher than rates of small and medium-sized firms. *Heller*, 832 F.Supp.2d at 45–46.

### 1.  *Williams & Connolly LLP*

W&C is a firm of approximately 250 lawyers, all based in Washington, D.C. The hourly rates it charged for this matter are well within the norm for rates charged by large D.C. law firms. According to the *National Law Journal* 2012 Law Firm Billing Survey, attached to this Memorandum as Exhibit 1, the hourly rates of partners at the Washington D.C. firms included in

8

the survey ranged from $315 to $1,250 with average rates ranging from $560 to $750. The hourly rates of associates at those firms ranged from $200 to $665 with average rates ranging from $310 to $465. Similarly, according to 2012 data collected by the Corporate Executive Board, attached to this Memorandum as Exhibit 2, the hourly rates of D.C. partners with 21 years of experience or more typically fell between $575 (1st quartile) and $810.84 (3rd quartile); the hourly rates of D.C. associates with 3 to fewer than 7 years of experience typically fell between $330 (1st quartile) and $490 (3rd quartile); and the hourly rates of D.C. associates with fewer than 3 years of experience typically fell between $303.29 (1st quartile) and $434.94 (3rd quartile). Ex. 4, at 21, 26. W&C's rates—$765 for Mr. Baine, a partner with over 35 years of experience; $409.50 for Mr. Tarosky, a sixth-year associate with five years of experience; and $342 for Ms. Baumgarten, a third-year associate with two years of experience—fall comfortably within those ranges.[3]

Furthermore, the rates charged by W&C are materially lower than rates recently approved by courts in this jurisdiction for attorneys of comparable reputation and experience in large law firms. Judge Leon, for example, recently approved rates for attorneys at Winston & Strawn of $780–810 for a senior partner, $525 for a fifth-year associate, and $390 for a first-year associate, all of which exceed the rates charged here. *See McKesson*, 2013 WL 1224808, at *5; *McKesson*, No. 1:82-cv-00220, Dkt. No. 983-2, (Supplemental Motion for Attorney Fees, Ex. 2). Moreover, Judge Collyer previously found the standard rates charged by W&C to be reasonable and noted that its actual bills to the client had effectively reduced its standard rates by a total of

---

[3] W&C's rates are also in line with the rates set forth in the Updated Laffey Matrix described in note 4, *infra*. As a partner with 38 years of experience, Mr. Baine's rate is within 2% ($13) of the Updated Matrix's rate for partners with over 20 years of experience ($753). The rates for associates at Mr. Tarosky's and Ms. Baumgarten's levels are $383 and $312, respectively. The rates charged for their time are within 10% of those rates.

22 percent—which is exactly what the firm did in this litigation. *Wilcox v. Sisson*, 2006 WL 1443981, at *5 (D.D.C. May 25, 2006).

### 2. *Levine Sullivan Koch & Schulz, LLP*

Levine Sullivan is a boutique law firm with 34 lawyers that has a recognized national media law practice. As a specialty boutique, however, it competes with large law firms, not small or mid-sized firms that offer general legal service practices. For example, of the nine law firms that are ranked first or second by *Chambers USA* in the area of Media Law, Levine Sullivan is the only firm with fewer than 250 lawyers. Siegel Decl. ¶ 4. As such, the relevant community of "attorneys of reasonably comparable skill, experience, and reputation," *Covington*, 57 F.3d at 1108, are media law practice groups in larger law firms. Levine Sullivan's rates are thus lower than large law firms, but may be higher than rates charged by some comparably-sized, general service firms with local or regional practices. Defendants have not been able to locate any survey data that addresses a practice of this nature. However, Levine Sullivan's rates are well below the survey rates discussed in Part 2.A.1, *supra*. Moreover, courts in the Southern District of New York have recognized the nature of specialty boutiques in related areas such as intellectual property law (which comprises a significant portion of Levine Sullivan's practice), and have been willing to award fees at rates for such firms that are far higher than what Levine Sullivan seeks here. *See, e.g., Yurman Designs, Inc. v. PAJ, Inc.*, 125 F. Supp. 2d 54 (S.D.N.Y. 2000) (approving rates of more than $500 per partner for the Pryor, Cashman boutique firm more than a decade ago).

As an additional indication of their reasonableness, Levin Sullivan's rates are and resulting fees are consistent with the "Laffey" Matrix, originally promulgated by the U.S. Attorney's Office "'to indicate . . . [the] rates to which the government will not object,'"

*McKesson*, 2013 WL 1224808, at *5 (quoting *Novak v. Capital Mgmt. & Dev. Corp.*, 496 F. Supp. 2d 156, 159 (D.D.C. 2007)), and referenced by courts in D.C. as one barometer of market rates, including for firms that are much smaller than Levine Sullivan. *See Heller*, 832 F. Supp. 2d at 48–49; *Queen Anne's Conservation Ass'n v. U.S. Dept. of State*, 800 F.Supp.2d 195, 200–01 (D.D.C. 2011); *Campbell-Crane & Assocs., Inc. v. Stamenkovic*, 44 A.3d 924 (D.C. 2012); *Lively v. Flexible Packaging Ass'n*, 930 A.2d 984 (D.C. 2007). "While use of the Laffey matrix has been upheld by [this] Circuit since 1988, there are two different versions of it used as proof of [the] prevailing market rates in federal court litigation in the District of Columbia."[4] *Smith v. District of Columbia*, 466 F. Supp. 2d 151, 156 (D.D.C. 2006). *Compare Embassy of Fed. Rep. of Nigeria v. Ugwuonye*, 2013 WL 3816399, at *10 (D.D.C. July 24, 2013) (relying on USAO Laffey Matrix) *with Smith*, 466 F. Supp. 2d at 156 (using Updated Laffey Matrix). A current copy of the USAO Laffey Matrix is attached to this Memorandum as Exhibit 3 and is available at http://www.justice.gov/usao/dc/divisions/civil.html. A current copy of the Updated Laffey Matrix is attached to this Memorandum as Exhibit 4 and is available online at http://www.laffeymatrix.com/see.html. Levine Sullivan's rates are reasonable under either methodology.

The rates in the USAO Laffey Matrix for 2012 to 2013 are $505 for both Mr. Siegel and Mr. Berlin, who have twenty or more years of experience, and $290 for Ms. Jones, a fourth-year

---

[4] The *Smith* court offered the following explanation of the differences between the two matrices: "One version, which is maintained by the Civil Division of the Office of the United States Attorney ("USAO Matrix"), calculates the matrix rate for each year by adding the change in the overall cost of living, as reflected in the United States Consumer Price Index ("CPI") for the Washington, D.C., area for the prior year, and then rounding that rate to the nearest multiple of $5. A second, slightly different version of the *Laffey* Matrix ("Updated Matrix"), also in use in the Washington, D.C., area, calculates the matrix rates for each year by using 'the legal services component of the CPI rather than the general CPI on which the U.S. Attorney's Office Matrix is based.'" *Id.* at 156 (quoting *Salazar v. District of Columbia*, 123 F. Supp. 2d 8, at 14 (D.D.C. 2000)).

11

associate. Based on the time each attorney actually spent on this matter, the USAO Laffey Matrix would yield an effective "blended" rate of $390 for those attorneys—the precise rate that Levine Sullivan charged.[5] If the Updated Laffey Matrix were used, the fees would be substantially higher. With respect to paralegal rates, Levine Sullivan's rates were $50 higher than the USAO Laffey Matrix rate, $20 higher than the Updated Laffey Matrix rate, and about $35–$80 lower than the rates charged by large law firms. Dr. Schanzer respectfully submits that the $195 rate the insurer negotiated and paid, which is within that range, is presumptively the reasonable one to award. Moreover, Levine Sullivan does not charge clients for many of the expenses typically associated with paralegal and associate work, such as online research and copying charges, so its rates are effectively lower still.

### B.     Defendants Expended a Reasonable Number of Hours.

Once a reasonable hourly rate has been identified, the Court must determine "the number of hours reasonably expended on the litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). In this Circuit, the fee application need not present "'the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney.'" *Copeland*, 641 F.2d at 891 (quoting *Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3d Cir. 1973)). Rather, the application need only be sufficiently detailed to permit the District Court to make an independent determination whether or not the hours claimed are justified. Indeed, "[t]he better practice is to prepare

---

[5]   If the USAO Laffey Matrix rates were applied, the value of the attorney time requested in this application would be $96,863. The actual fees for attorney time requested are $97,071. Moreover, courts using the Laffey Matrix permit reimbursing amounts billed to clients for expenses such as online research, copying, and delivery charges, which would typically be about $5,000 for a matter of this nature involving research-intensive motion practice. Thus, Levine Sullivan's total fees and costs are actually meaningfully lower than a comparable, Laffey-based fee award.

detailed summaries based on contemporaneous time records indicating the work performed by each attorney for whom fees are sought." *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1327 (D.C. Cir. 1982) (per curiam) (encouraging fee-seeking parties to support their request with "detailed *summaries* based on contemporaneous time records") (emphasis added); *see also McKesson*, 2013 WL 1224808, at *6–7 (same); *Beck v. Test Masters Educ. Servs., Inc.*, 289 F.R.D. 374, 384 (D.D.C. 2013) ("in submitting the log of the hours for which they request compensation, supported by a sworn declaration from the supervising attorney, plaintiffs have provided exactly the sort of evidence that courts normally consider in evaluating the reasonableness of a fee award").

In support of their application for attorneys' fees, Defendants have explained in detailed summaries the total number of hours Defendants reasonably expended. *See* Siegel Decl. ¶ 19 and Ex. E; Baine Decl. ¶ 11 and Ex. A. Defendants have detailed the type and amount of work performed by each attorney and paralegal on this matter by category. The foregoing establishes that Defendants' request for attorneys' fees and costs is reasonable.[6]

Moreover, the combined efforts of the two law firms reflect both an efficient division of labor and a positive result. Both firms have sophisticated clients who scrutinize bills for reasonableness. Both firms independently examined their own raw bills and reduced the amounts actually billed to their clients by 8 to 12 percent. Both firms spent a similar amount of time on the litigation, and both staffed the matter in the manner that is typical of large and small

---

[6] With respect to Dr. Schanzer, he submits that in assessing a reasonable fee award for this litigation, it is also appropriate for the Court to consider that he reasonably incurred additional fees that were a result of Plaintiff's pre-litigation conduct. Siegel Decl. ¶ 18.

law firms, producing similar fees.[7] The litigation itself involved numerous complex legal questions, including an issue with respect to the Anti-SLAPP Act that has not been definitively resolved in this Circuit.

## CONCLUSION

In sum, Defendant Schanzer seeks a total of $105,124.50 in fees and $2,050 in costs, and Defendant Foreign Policy LLP seeks a total of $94,936.04 in fees and $5,545.37 in costs. Those amounts are reasonable, and Defendants respectfully request that they be awarded.[8]

Dated: October 25, 2013

By:   /s/ Kevin T. Baine

WILLIAMS & CONNOLLY LLP

Kevin T. Baine (Bar No. 238600)
Adam R. Tarosky (Bar No. 983920)
Elise M. Baumgarten (Bar No. 1006246)

725 Twelfth Street, NW
Washington, DC  20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

By:   /s/ Nathan E. Siegel

LEVINE SULLIVAN KOCH & SCHULZ, LLP

Nathan E. Siegel (Bar No. 446253)
Seth D. Berlin (Bar No. 433611)
Shaina D. Jones (Bar No. 1002801)

1899 L Street, NW, Suite 200
Washington, DC  20036
Telephone: (202) 508-1100
Facsimile: (202) 861-9888

---

[7] For example, Levine Sullivan has 20 partners and 13 associates. Williams & Connolly has 115 partners and 126 associates. Boutique firms such as Levine Sullivan thus typically staff cases more with partners, but those partners charge materially lower rates.

[8] Defendants reserve the right to seek fees and costs for all work performed on this case subsequent to this Court's decision granting the anti-SLAPP motion. This includes, but is not limited to, the current on-going litigation over fees, the appeal on the merits that Plaintiff has filed, and any other subsequent litigation. All of those proceedings are on-going, and in any event, Defendants are not in a position to seek any fees and costs for work performed after September 2013 because they have not yet billed their clients for any such work. Defendants would likely file a supplemental application for all post-judgment fees and costs after all future proceedings in this case are finally exhausted.

kbaine@wc.com  
atarosky@wc.com  
ebaumgarten@wc.com  

*Counsel for Defendant Foreign Policy Group, LLC*

nsiegel@lskslaw.com  
sberlin@lskslaw.com  
sjones@lskslaw.com  

*Counsel for Defendant Jonathan Schanzer*